[No. S022805. July 9, 1992.]

JULIA BURGESS, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
NARENDRA GUPTA et al., Real Parties in Interest.

**Counsel**

David Silverton, Shaun L. Quinlan and Michael J. McKeown for Petitioner.

No appearance for Respondent.

Bonne, Jones, Bridges, Mueller & O'Keefe, Peter A. Schneider, Keith M. Staub and Cameron J. Whitehead for Real Parties in Interest.

Horvitz & Levy, Kathy L. Eldredge and David S. Ettinger as Amici Curiae on behalf of Real Parties in Interest.

**Opinion**

**PANELLI, J.**—Can a mother recover damages for negligently inflicted emotional distress against a physician who entered into a physician-patient relationship with her for care during labor and delivery if her child is injured during the course of the delivery? Because the professional malpractice alleged in this case breached a duty owed to the mother as well as the child, we hold that the mother can be compensated for emotional distress resulting from the breach of the duty. For public policy reasons that have been previously articulated by this court, however, these damages do not extend to emotional distress due to loss of affection, society, companionship or similar harm that the mother may incur in adjusting to and living with the child's impairments.

### I. Background

This proceeding arises out of the alleged negligent delivery of Joseph Moody II (Joseph). The petitioner (plaintiff) is Julia Burgess (Burgess),

Joseph's mother. The real party in interest (defendant) is Narendra Gupta, M.D. (Gupta), the obstetrician who delivered Joseph.[1]

The facts relevant to our decision are not in dispute. On February 26, 1988, Burgess entered labor. She was admitted to the hospital under the care of Gupta, her obstetrician, who had also participated in her prenatal care.[2] At approximately 12:50 p.m., Gupta artificially ruptured Burgess's membranes. Shortly thereafter, according to Burgess, Gupta yelled to the nurse: "Emergency, prolapsed cord."[3] At that point, Burgess "knew that something was wrong" with the delivery. Preparations were begun for a cesarean section.

Approximately 21 minutes elapsed between the time that Gupta diagnosed the cord prolapse and the time Burgess was taken to emergency surgery. During the interim, Gupta was in and out of Burgess's room. According to Burgess, "When he would come back into the room, he would yell, 'Breathe, breathe, because your baby ain't getting enough oxygen.' "

Burgess was placed under general anesthesia for the cesarean section. She was told as she was wheeled out of the recovery room that "something" was wrong with her baby boy. She was given another sedative. The first time she recalls feeling distressed about Joseph's condition was several hours later after she awoke from the sedative.

Joseph was deprived of sufficient oxygen through his umbilical cord for approximately 44 minutes before his delivery. He suffered permanent brain and nervous system damage, allegedly as a result of the deprivation of oxygen. He was not released from Children's Hospital (where he was transferred for specialized treatment) until a month after his birth.

Joseph, Burgess and Joseph Moody (Moody), the father of Joseph, brought suit against Gupta and the hospital. In this suit, Burgess and Moody both sought recovery for emotional distress suffered as a result of the defendants' negligence. Moody's claim was dismissed by the trial court for failure to comply with discovery requests and is no longer at issue.[4] Joseph died during the course of the litigation, allegedly as the result of his injuries.

---

[1]West Covina Hospital (hospital), the facility at which Joseph was born, is also a defendant and real party in interest. The hospital has not participated in this proceeding.

[2]Gupta was not the sole provider of Burgess's prenatal care. She also received prenatal care through Community Health Projects, Inc. (clinic). The clinic referred Burgess to Gupta.

[3]A prolapsed, or compressed, umbilical cord may diminish or stop the flow of oxygen to the fetus. (2 Louisell & Williams, Medical Malpractice (1991) ¶ 17G.18[2][c]; cf. Cunningham et al., Williams Obstetrics (18th ed. 1989) p. 680.)

[4]Amicus curiae California Trial Lawyers Association raised and briefed the issue of whether a father, such as Moody, should be permitted to recover for negligent infliction of

A wrongful death action was subsequently filed by Burgess and was consolidated with the original malpractice action.

Defendants brought a motion requesting summary adjudication that Burgess is not entitled to recover damages for emotional distress from the defendants. The defendants argued that Burgess did not contemporaneously observe Joseph's injury as required by this court in *Thing* v. *La Chusa, supra,* 48 Cal.3d 644 (hereafter *Thing*), for recovery in a "bystander" situation and was not a direct victim of Gupta's negligence pursuant to *Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813] (hereafter *Molien*). Relying primarily upon *Thing*, the trial court granted the motion.

Burgess petitioned the Court of Appeal for a writ of mandate vacating the trial court's order. The appellate court granted the writ in a brief decision in which it held that *Thing, supra,* 48 Cal.3d 644, was not controlling under the facts presented by this case, because Burgess was a "direct victim" rather than a "bystander."

Recognizing the unique relationship between mother and child during pregnancy and childbirth, we granted review in order to address the recurring question of whether a mother can recover damages for the emotional distress suffered as a result of a negligent delivery causing injury to her child.

## II. DISCUSSION

A. *Because Gupta Owed a Preexisting Duty of Care to Burgess, the Criteria for Recovery of Negligent Infliction of Emotional Distress Enunciated in Thing Are Not Controlling in This Case.*

The law of negligent infliction of emotional distress in California is typically analyzed, as it was in this case, by reference to two "theories" of recovery: the "bystander" theory and the "direct victim" theory. In cases involving family relationships and medical treatment, confusion has reigned as to whether and under which "theory" plaintiffs may seek damages for negligently inflicted emotional distress.[5]

Because the use of the "direct victim" designation has tended to obscure, rather than illuminate, the relevant inquiry in cases such as the one at hand,

---

emotional distress resulting from injuries inflicted upon his child during childbirth. While it appears that the contemporaneous observation requirement of *Thing* v. *La Chusa* (1989) 48 Cal.3d 644 [257 Cal.Rptr. 865, 771 P.2d 814] would bar this claim, we decline to decide the issue, since Moody's claim has been dismissed.

[5]Compare, e.g., *Ochoa* v. *Superior Court* (1985) 39 Cal.3d 159 [216 Cal.Rptr. 661, 703 P.2d 1] (permitting recovery by parents on "bystander theory," rather than "direct victim theory,"

we briefly turn our attention to the present state of the law in this area before proceeding to apply this law to the facts that confront us.

■ We have repeatedly recognized that "[t]he *negligent* causing of emotional distress is not an independent tort, but the tort of *negligence*. [Citation.] The traditional elements of duty, breach of duty, causation, and damages apply. [¶] Whether a defendant owes a duty of care is a question of law. Its existence depends upon the foreseeability of the risk and a weighing of policy considerations for and against imposition of liability. [Citation.]" (*Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583, 588 [257 Cal.Rptr. 98, 770 P.2d 278], italics in the original, internal quotation marks omitted [hereafter *Marlene F.*]; accord, *Christensen* v. *Superior Court* (1991) 54 Cal.3d 868, 882, 884 [2 Cal.Rptr.2d 79, 820 P.2d 181] [hereafter *Christensen*].)

The distinction between the "bystander" and "direct victim" cases is found in the source of the duty owed by the defendant to the plaintiff. ■ The "bystander" cases, commencing with *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912], and culminating in *Thing, supra,* 48 Cal.3d 644, address "the question of duty in circumstances in which a plaintiff seeks to recover damages as a percipient witness to the injury of another." (*Christensen, supra,* 54 Cal.3d at p. 884.) These cases "all arise in the context of physical injury or emotional distress caused by the negligent conduct of a defendant *with whom the plaintiff had no preexisting relationship, and to whom the defendant had not previously assumed a duty of care beyond that*

as a result of parents' observation of defendants' failure to treat deathly ill child); *Schwartz* v. *Regents of the University of California* (1990) 226 Cal.App.3d 149 [276 Cal.Rptr. 470] (denying recovery to father for refusal of child's therapist to provide father with information about child's whereabouts); *Golstein* v. *Superior Court* (1990) 223 Cal.App.3d 1415 [273 Cal.Rptr. 270] (denying parents recovery of damages for emotional distress based upon lack of contemporaneous knowledge of child's injury arising from administering overdose of radiation to child); *Hurlbut* v. *Sonora Community Hospital* (1989) 207 Cal.App.3d 388 [254 Cal.Rptr. 840] (reversing judgment for parents who recovered damages for emotional distress solely under bystander theory arising from injury to child during labor and delivery); *Martinez* v. *County of Los Angeles* (1986) 186 Cal.App.3d 884 [231 Cal.Rptr. 96] (denying recovery to parents for "restructuring life" to care for child injured at birth); *Newton* v. *Kaiser Foundation Hospitals* (1986) 184 Cal.App.3d 386 [228 Cal.Rptr. 890] (permitting parents of child left partially paralyzed during birth to plead entitlement to damages for emotional distress); *Andalon* v. *Superior Court* (1984) 162 Cal.App.3d 600 [208 Cal.Rptr. 899] (permitting recovery by parents for failure to diagnose Down's Syndrome in child prior to birth); *Wiggins* v. *Royale Convalescent Hospital* (1984) 158 Cal.App.3d 914 [206 Cal.Rptr. 2] (denying recovery of damages for emotional distress to wife for convalescent home's failure to prevent husband's injurious fall); *Sesma* v. *Cueto* (1982) 129 Cal.App.3d 108 [181 Cal.Rptr. 12] (finding a question of fact sufficient to warrant trial of mother's claim for damages for emotional distress arising out of death of child at birth); *Johnson* v. *Superior Court* (1981) 123 Cal.App.3d 1002 [177 Cal.Rptr. 63] (permitting mother to state claim for emotional distress resulting from stillbirth as part of her medical malpractice claim).

*owed to the public in general.*" (*Ibid.*, italics added.) In other words, bystander liability is premised upon a defendant's violation of a duty not to negligently cause emotional distress to people who observe conduct which causes harm to another.

Because in such cases the class of potential plaintiffs could be limitless, resulting in the imposition of liability out of all proportion to the culpability of the defendant, this court has circumscribed the class of bystanders to whom a defendant owes a duty to avoid negligently inflicting emotional distress. These limits are set forth in *Thing* as follows: "In the absence of physical injury or impact to the plaintiff himself, damages for emotional distress should be recoverable only if the plaintiff: (1) is closely related to the injury victim, (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim and (3) as a result suffers emotional distress beyond that which would be anticipated in a disinterested witness." (48 Cal.3d at p. 647.)[6]

 In contrast, the label "direct victim" arose to distinguish cases in which damages for serious emotional distress are sought as a result of a breach of duty owed the plaintiff that is "assumed by the defendant or imposed on the defendant as a matter of law, or that arises out of a relationship between the two." (*Marlene F., supra,* 48 Cal.3d at p. 590.) In these cases, the limits set forth in *Thing, supra,* 48 Cal.3d 644, have no direct application. (*Marlene F., supra,* 48 Cal.3d at p. 589, fn. 4; *Christensen, supra,* 54 Cal.3d at pp. 890-891.) Rather, well-settled principles of negligence are invoked to determine whether all elements of a cause of action, including duty, are present in a given case.

Much of the confusion in applying rules for bystander and direct victim recovery to the facts of specific cases can be traced to this court's decision in *Molien,* which first used the "direct victim" label. In that case, we answered in the affirmative the question of whether, in the context of a negligence action, damages may be recovered for serious emotional distress unaccompanied by physical injury. (*Molien, supra,* 27 Cal.3d at pp. 927-931.)

In so holding, we found that a hospital and a doctor owed a duty directly to the husband of a patient, who had been diagnosed incorrectly by the doctor as having syphilis and had been told to so advise her husband in order that he could receive testing and, if necessary, treatment. (*Molien, supra,* 27

---

[6]The requirement that the emotional distress suffered be "serious" has its origins in *Molien.* (27 Cal.3d at pp. 928-930.) This requirement, thus, also applies to "direct victim" cases. The purpose of this requirement is to guard against the litigation of trivial or fraudulent claims. (*Id.* at pp. 927-930; see also Davies, *Direct Actions for Emotional Harm: Is Compromise Possible?* (1992) 67 Wash. L. Rev. 1, 48-49.)

Cal.3d at p. 923.) We reasoned that the risk of harm to the husband was reasonably foreseeable and that the "alleged tortious conduct of the defendant was directed to him as well as to his wife." (*Id.* at pp. 922-923.) Under such circumstances we deemed the husband to be a "direct victim" and found the criteria for bystander recovery not to be controlling. (*Id.* at p. 923.)

The broad language of the *Molien* decision, coupled with its perceived failure to establish criteria for characterizing a plaintiff as a "direct victim" rather than a "bystander," has subjected *Molien* to criticism from various sources, including this court. (E.g., *Thing, supra,* 48 Cal.3d at pp. 658-664.) The great weight of this criticism has centered upon the perception that *Molien* introduced a new method for determining the existence of a duty, limited only by the concept of foreseeability. To the extent that *Molien, supra,* 27 Cal.3d 916, stands for this proposition, it should not be relied upon and its discussion of duty is limited to its facts. As recognized in *Thing,* "[I]t is clear that foreseeability of the injury alone is not a useful 'guideline' or a meaningful restriction on the scope of [an action for damages for negligently inflicted emotional distress.]" (48 Cal.3d at p. 663.)

Nevertheless, other principles derived from *Molien, supra,* 27 Cal.3d 916, are sound: (1) damages for negligently inflicted emotional distress may be recovered in the absence of physical injury or impact, and (2) a cause of action to recover damages for negligently inflicted emotional distress will lie, notwithstanding the criteria imposed upon recovery by bystanders, in cases where a duty arising from a preexisting relationship is negligently breached. (*Christensen, supra,* 54 Cal.3d at pp. 890-891; *Marlene F., supra,* 48 Cal.3d at pp. 590-591.) In fact, it is this later principle which defines the phrase "direct victim." That label signifies nothing more.

Gupta, however, has succumbed to the confusion in this area by failing to recognize that the distinction between bystander and direct victim cases is found in the source of the duty owed by the defendant to the plaintiff. Gupta argues, relying upon *Ochoa v. Superior Court, supra,* 39 Cal.3d 159 (hereafter *Ochoa*), that, when the emotional distress for which damages are claimed is "purely derivative" of the injury of another, the plaintiff may only recover such damages by satisfying the criteria for bystander recovery. Gupta claims that Burgess's damages are "derivative" because he owed no duty of care to Burgess to avoid injuring her child. Therefore, she may recover for her emotional distress, if at all, only as a bystander. We disagree.

In *Ochoa,* the parents sought damages for the emotional distress that they suffered from witnessing the defendants' failure to provide adequate medical

care to their son, who was incarcerated. We held that the parents could state a claim for such damages, but only as bystanders, not as direct victims. In so holding we stated, "the defendants' negligence . . . was directed primarily at the decedent, with Mrs. Ochoa looking on as a helpless bystander as the tragedy of her son's demise unfolded before her." (*Ochoa, supra,* 39 Cal.3d at pp. 172-173.) In *Ochoa* the defendants had no preexisting relationship with the parents upon which to premise a duty of care; therefore, Mrs. Ochoa was necessarily in the position of a bystander with respect to her son's health care. The source of the duty, rather than the "derivative nature" of the injuries suffered by Mrs. Ochoa, was determinative.

In contrast to the facts of *Ochoa* and *Molien,* we are presented in this case with a "traditional" plaintiff with a professional negligence cause of action. Gupta cannot and does not dispute that he owed a duty of care to Burgess arising from their physician-patient relationship. (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 776, p. 116 ["Liability for malpractice arises where there is a relationship of physician-patient between the plaintiff and the defendant doctor; the relationship gives rise to the duty of care."].) Rather, Gupta contends that, while his alleged negligence resulting in injury to Joseph breached a duty of care owed to Joseph, it did not breach a duty of care owed to Burgess.[7] In other words, Gupta claims that the scope of the duty of care owed to Burgess was limited to avoiding physical injury to her during her prenatal care and labor; it did not extend to avoiding injury to her fetus and the emotional distress that would result from such an injury. The origin of these mutually exclusive duties to Burgess and Joseph is apparently Gupta's unsupported assertion that Burgess and Joseph were two separate patients, because his actions could physically injure one and not the other.

---

[7]In addition to *Ochoa, supra,* 39 Cal.3d 159, Gupta also relies upon two cases in which the appellate courts barred parents from recovering damages for emotional distress arising from the negligent actions of their children's health care providers. (*Golstein* v. *Superior Court, supra,* 223 Cal.App.3d 1415 [court denied recovery of damages for emotional distress to parents whose child was fatally injured by a dose of radiation given to treat curable cancer]; *Schwartz* v. *Regents of University of California, supra,* 226 Cal.App.3d 149 [court denied recovery for damages for emotional distress suffered by father when child's therapist refused to reveal child's whereabouts].) In these cases, the duty of the health care providers clearly ran to the children-patients. As in *Ochoa,* there was no preexisting relationship between the health care providers and the parents upon which a duty of care could be premised. Thus, the appellate courts correctly held that the parents were "bystanders" for purposes of analyzing their emotional distress claims. These cases, however, are simply inapposite to the situation at hand in which Gupta, by virtue of his physician-patient relationship with Burgess, assumed a duty of care to Burgess, the scope of which extended to providing competent medical treatment for both Burgess and her fetus. The reasoning and results of these cases cited by Gupta, therefore, are wholly consistent with our decision herein.

To accept Gupta's argument would require us to ignore the realities of pregnancy and childbirth. Burgess established a physician-patient relationship with Gupta for medical care which was directed not only to her, but also to her fetus. The end purpose of this medical care may fairly be said to have been to provide treatment consistent with the applicable standard of care in order to maximize the possibility that Burgess's baby would be delivered in the condition in which he had been created and nurtured without avoidable injury to the baby or to Burgess. (Cf. Cunningham et al., Williams Obstetrics, *supra*, at p. 1.) Moreover, during pregnancy and delivery it is axiomatic that any treatment for Joseph necessarily implicated Burgess's participation since access to Joseph could only be accomplished with Burgess's consent and with impact to her body.

In addition to the physical connection between a woman and her fetus, there is an emotional relationship as well. The birth of a child is a miraculous occasion which is almost always eagerly anticipated and which is invested with hopes, dreams, anxiety, and fears. In our society a woman often elects to forego general anesthesia or even any anesthesia, which could ease or erase the pain of labor, because she is concerned for the well-being of her child and she anticipates that her conscious participation in and observance of the birth of her child will be a wonderful and joyous occasion. An obstetrician, who must discuss the decision regarding the use of anesthesia with the patient, surely recognizes the emotionally charged nature of pregnancy and childbirth and the concern of the pregnant woman for her future child's well-being. The obstetrician certainly knows that even when a woman chooses to or must undergo general anesthesia during delivery, the receiving of her child into her arms for the first time is eagerly anticipated as one of the most joyous occasions of the patient's lifetime. It is apparent to us, as it must be to an obstetrician, that for these reasons, the mother's emotional well-being and the health of the child are inextricably intertwined.

It is in light of both these physical and emotional realities that the obstetrician and the pregnant woman enter into a physician-patient relationship. It cannot be gainsaid that both parties understand that the physician owes a duty to the pregnant woman with respect to the medical treatment provided to her fetus. Any negligence during delivery which causes injury to the fetus and resultant emotional anguish to the mother, therefore, breaches a duty owed directly to the mother.

Thus, as the Court of Appeal correctly determined in this case, the failure by Burgess to satisfy the criteria for recovery under *Thing, supra,* 48 Cal.3d 644, does not end the inquiry. The alleged negligent actions resulting in physical harm to Joseph breached a duty owed to both Joseph and Burgess.

Burgess was unavoidably and unquestionably harmed by this negligent conduct. (*Christensen, supra,* 54 Cal.3d at pp. 886-887, 890-891 [in upholding cause of action to recover damages for emotional distress arising out of improperly performed funeral services, this court recognized that the emotional state of the bereaved plaintiffs dictated that the duty of care assumed by those providing funeral services included not merely performing cremations, but performing them in a dignified and respectful manner]; *Marlene F., supra,* 48 Cal.3d at p. 591 [in upholding a cause of action by a mother to recover damages for emotional distress arising out of the sexual molestation of her son by a therapist, who was treating both mother and son for intrafamily problems, this court recognized that the therapist's action breached a duty of care to the mother since it would directly injure her and cause her severe emotional distress and would harm the intrafamily relationship under his care].)

As in *Marlene F.,* once the scope of the duty of care assumed by Gupta to Burgess is understood, Burgess's claim for emotional distress damages may simply be viewed as an ordinary professional malpractice claim, which seeks as an element of damage compensation for her serious emotional distress. The elements of a claim for professional negligence incorporate a specific standard of care into the elements of a negligence claim. ■ "The elements of a cause of action in tort for professional negligence are: (1) the duty of the professional to use such skill, prudence and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence. [Citations.]" (*Budd* v. *Nixen* (1971) 6 Cal.3d 195, 200 [98 Cal.Rptr. 849, 491 P.2d 433].) A plaintiff in a case of medical malpractice may recover damages for emotional distress. (See *Marlene F., supra,* 48 Cal.3d at pp. 591, fn. 6 (lead opn. of Arguelles, J.), 599 (conc. opn. of Eagleson, J.); *Molien, supra,* 27 Cal.3d at pp. 930-931; 2 Louisell & Williams, Medical Malpractice, *supra,* at ¶ 18.11.)

Moreover, contrary to Gupta's assertions, the imposition of liability in this case would not be an unprecedented extension of the law. We note that our holding has been foreshadowed by several decisions of our Courts of Appeal. Although relying upon differing theories to support claims for damages for emotional distress suffered by mothers whose children were harmed or died as a result of obstetrical malpractice, the majority of our appellate courts, which have considered the issue, have ruled in favor of a

mother's right to plead and prove such damages. (*Newton* v. *Kaiser Foundation Hospitals, supra,* 184 Cal.App.3d 386 [parents[8] of a child left partially paralyzed as a result of the application of allegedly excessive traction during birth may recover damages for emotional distress suffered]; *Andalon* v. *Superior Court, supra,* 162 Cal.App.3d 600 [reversal of partial summary judgment of parents' claim for damages for emotional distress arising from defendant's failure to prenatally diagnose Down's Syndrome]; *Sesma* v. *Cueto, supra,* 129 Cal.App.3d 108 [reversal of partial summary judgment of mother's claim for damages for emotional distress arising out of death of her child during birth]; *Johnson* v. *Superior Court, supra,* 123 Cal.App.3d 1002 [demurrer sustained to mother's cause of action for negligent infliction of emotional distress, but right to recover emotional distress suffered as result of stillbirth held to be part of mother's pending malpractice claim]; but see *Martinez* v. *County of Los Angeles, supra,* 186 Cal.App.3d 884 [parents of a child who allegedly suffered brain damage during birth could not recover damages for their emotional distress incurred primarily as a result of "restructuring their lives" to care for the child]; *Hurlbut* v. *Sonora Community Hospital, supra,* 207 Cal.App.3d 388 [parents of child severely brain damaged during birth could not recover damages for their emotional distress under a bystander theory; no other theory was presented at trial].)

As the majority of lower courts have recognized, *Thing, supra,* 48 Cal.3d 644, does not control recovery by a mother for emotional distress suffered as a result of the negligent injury of her child during labor and delivery. Under the facts of this case, Burgess is not a "bystander" for purposes of bringing a claim for compensation for damages for her serious emotional distress. Burgess is permitted to recover these damages as a result of the breach of the duty of care arising from the physician-patient relationship between Gupta and Burgess. Gupta's negligent breach of this duty is sufficient to satisfy the elements of a claim alleged for professional malpractice on Burgess's behalf.

### B. *Lack of Physical Injury Does Not Defeat Burgess's Claim.*

Gupta also seeks to win summary adjudication by negating the damage element of Burgess's claim. To accomplish this end, Gupta contends that Burgess has not alleged that she suffered physical injury.

██ Gupta's argument is unpersuasive. First, Gupta overlooks the fact that Burgess has pled injury to her "nervous system and person." Gupta

---

[8]The issue of a father's recovery for negligent infliction of emotional distress resulting from injuries to his child during prenatal care and birth is not before us in this case. (See, *ante,* at pp. 1070-1071, fn. 4.) We note, however, that the physician-patient relationship critical to a mother's cause of action is almost always absent in a father's claim. It, therefore, appears that a father must meet the criteria set forth in *Thing, supra,* 48 Cal.3d 644, if he is to state a viable claim.

presented no evidence to dispute this alleged physical injury. Rather, Gupta confined his motion to the argument that Burgess's claim fails because she did not suffer any physical injury that was wholly unrelated to the emotional distress stemming from Joseph's injuries. In other words, the source of Burgess's injuries relegated her to "bystander" status. For the reasons set forth above, this contention fails.

Moreover, even if Burgess had failed to allege physical injuries, physical injury is not a prerequisite for recovering damages for *serious* emotional distress, especially when, as here, there exists a "guarantee of genuineness in the circumstances of the case." (*Molien, supra,* 27 Cal.3d at pp. 928-930, citation and internal quotation marks omitted.) Serious emotional distress itself satisfies the damage element of Burgess's cause of action.

C. *Public Policy Considerations Do Not Support the Drastic Limitation for Which Gupta Argues.*

Gupta further urges that Burgess must be denied recovery for damages for the emotional distress that she has suffered on various public policy grounds. We do not find, however, that public policy considerations justify denying Burgess the right to recover damages for the serious emotional distress that she suffered as a result of Gupta's alleged breach of duty arising out of their physician-patient relationship.

Our starting point in determining liability for negligence is the rule set forth in Civil Code section 1714, subdivision (a): "Everyone is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself." We have previously stated in the context of analyzing a claim for damages for emotional distress that "[i]n the absence of a statutory provision limiting this rule, exceptions to the general principle imposing liability for negligence are recognized only when clearly supported by public policy." (*Christensen, supra,* 54 Cal.3d at p. 885, citing *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].)

We also have previously recognized that several factors should be considered in determining the existence of a duty. The factors include: " 'the foreseeability of harm to the plaintiff, the degree of certainty that plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the

defendant and the consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' " (*Christensen, supra,* 54 Cal.3d at pp. 885-886, quoting *Thompson* v. *County of Alameda* (1980) 27 Cal.3d 741, 750 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701].)

Although in this case the existence of the applicable duty is clearly established by virtue of the physician-patient relationship between Gupta and Burgess (*Marlene F., supra,* 48 Cal.3d at pp. 590-591), the considerations set forth above provide a framework for our review of Gupta's policy arguments against imposing liability. Analyzing these principles, we conclude that the recognition of liability in this case is fully consistent with them and that an exception to liability is not clearly supported by public policy.

1. *Foreseeability and certainty of mother's injury in labor and delivery cases.*

■■■■ It cannot be disputed that a negligent delivery of the type alleged by Burgess, resulting in permanent injury to her child, will foreseeably cause a mother serious emotional distress. This fact is patently obvious. (See, *ante,* at p. 1076.) Indeed, obstetricians are taught to consider the mother's concern for her fetus from the beginning of their studies. (Cunningham et al., Williams Obstetrics, *supra,* at p. 307 ["The pregnant woman very often approaches labor with two major fears: 'Will my baby be all right?' and 'Will labor be very painful?' Her concerns should also be uppermost in the minds of everyone who participates in caring for the mother and fetus."].)

During pregnancy, the mother and child are a unique physical unit. The welfare of each is "intertwined and inseparable." (Nocon, *Physicians and Maternal-Fetal Conflicts: Duties, Rights and Responsibilities* (1990-1991) 5 J. of Law and Health 1, 15.) Under such circumstances, it cannot be denied that a mother, who carries her fetus to term and begins labor, has formed a sufficiently close bond with her fetus that injury to the fetus during labor and delivery will cause her severe emotional distress. Nor can it be denied that this distress is foreseeable to her obstetrician. (See, *ante,* at p. 1076.) As one of our appellate courts has recognized: "It is . . . patently clear that a mother forms a sufficiently close relationship with her fetus during pregnancy so that its stillbirth [or injury] will foreseeably cause her severe emotional distress. Where the stillbirth [or injury] results from medical malpractice rather than from natural and unavoidable causes the loss is all the more poignant and should be legally redressable." (*Johnson* v. *Superior Court, supra,* 123 Cal.App.3d at p. 1007.)

### 2. *Closeness of connection between the conduct and the injury.*

Any medical care for the fetus, including assistance in its delivery, necessarily involves the mother's consent and bodily participation. An obstetrician's negligent delivery of a child, resulting in the child's injury, is closely (even inextricably) related to any emotional distress incurred by the mother upon her realization of the injury to her child. (See, *ante*, at p. 1076.)

### 3. *Moral blame.*

█ "[T]he legal standard of care required by doctors is the standard of practice required by their own profession." (Weiler, Medical Malpractice on Trial (1991) p. 19 [hereafter Weiler].) "The courts require only that physicians and surgeons exercise in diagnosis and treatment that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of the medical profession under similar circumstances. [Citations.]" (*Bardessono* v. *Michels* (1970) 3 Cal.3d 780, 788 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717].) Thus, liability is not found, and the label of malpractice is not placed upon a physician's actions, unless "some deviation by the [physician] from the standard of care that his peers consider appropriate in the situation under review" is proven. (Weiler, *supra*, at p. 25.) █ Whether the negligent act is the result of a momentary lapse of concentration or gross disregard for the health of the patient, in order to prevail on a claim for medical malpractice, a plaintiff must convince the trier of fact that the physician's peers would consider his act to be blameworthy. Under such circumstances, we cannot conclude that this factor supports a public policy limitation of a physician's liability to his patient.

### 4. *Prevention of future harm.*

One of the purposes of tort law is to deter future harm. (See generally, Bell, *Legislative Intrusions into the Common Law of Medical Malpractice: Thoughts about the Deterrent Effect of Tort Liability* (1984) 35 Syracuse L. Rev. 939 and articles cited therein [hereafter Bell, *Legislative Intrusions*].) In the area of birth injury, it is possible that the child's cause of action for his or her injuries may be an adequate deterrent of future similar harm. (Cf. *Turpin* v. *Sortini* (1982) 31 Cal.3d 220, 239 [182 Cal.Rptr. 337, 643 P.2d 954] [recognizing that recovery of out-of-pocket expenses, rather than general damages, could have sufficient deterrent effect in a "wrongful life" case]; Bell, *Legislative Intrusions, supra*, at pp. 975-990 [advancing the theory that the deterrent effect of malpractice suits derives from psychological factors, rather than financial sanctions].) However, the failure to find a

duty of care owed by an obstetrician to an expectant mother under the circumstances of this case would be inconsistent with the general rule that a patient can recover damages for emotional distress resulting from her physician's breach of duty and could lead to other related harm in labor and delivery.

First, we are reluctant to provide any incentives unrelated to the standard of care that could, even unconsciously, influence choices made by a physician regarding how care should be provided during labor and delivery. Relegating delivering mothers to the status of "bystanders" for purposes of recovering damages for their emotional distress could create such incentives. Under the bystander criteria, if the mother is rendered incapable of "observ-[ing] both the defendant's conduct and the resulting injury" and being "aware at the time that the conduct is causing the injury," then the mother cannot recover. (*Thing, supra*, 48 Cal.3d at p. 661.) Thus, an alert mother would pose a higher risk of a successful lawsuit for an obstetrician than a heavily or completely sedated mother. The incentives established by such a rule, therefore, could undermine advances in obstetrical care related to reducing the use during labor and delivery of sedative and anesthetic drugs that are potentially damaging to the fetus. (See Cunningham et al., Williams Obstetrics, *supra*, pp. 353, 355.)

Second, the failure to find a duty of care owed to the mother to avoid injuring the fetus would be inconsistent with prior decisions permitting a mother to state a claim against an obstetrician whose negligence results in stillbirth of, rather than injury to, the child. (*Justus* v. *Atchison* (1977) 19 Cal.3d 564, 581, fn. 15 [139 Cal.Rptr. 97, 565 P.2d 122]; *Johnson* v. *Superior Court, supra*, 123 Cal.App.3d at p. 1007.) Such a claim can only be based upon the recognition that the obstetrician owes a duty to the mother relating to the standard of medical care received by both her *and* her fetus. If no such duty is owed, then no cause of action lies. (*Budd* v. *Nixen, supra*, 6 Cal.3d at p. 200 [setting forth elements of a professional malpractice claim].) If a contrary rule were to be adopted, it is possible that a doctor could escape all civil liability for negligence which caused a stillbirth.[9]

### 5. *Consequences of the imposition of liability.*

We are, of course, aware of what has been termed a "crisis" in the availability and cost of medical malpractice insurance. (See, e.g., *American*

---

[9]The mother's medical malpractice claim is the only claim that can be brought against a doctor whose negligence has caused a stillbirth. Any action by the stillborn child is barred, because a child's cause of action for prenatal injuries is contingent upon live birth. (Civ. Code, § 29; *Norman* v. *Murphy* (1954) 124 Cal.App.2d 95 [268 P.2d 178]; *Scott* v. *McPheeters* (1939) 33 Cal.App.2d 629 [93 P.2d 678].) Similarly, there is no cause of action for wrongful death of a child unless a child is born alive. (*Justus* v. *Atchison, supra*, 19 Cal.3d at p. 578.)

*Bank & Trust Co.* v. *Community Hospital* (1984) 36 Cal.3d 359, 370-371 [204 Cal.Rptr. 671, 683 P.2d 670, 41 A.L.R. 4th 233]; Weiler, *supra,* at pp. 1-16; Professional Liability in the '80s, Reports 1-3 of the American Medical Association Special Task Force on Professional Liability and Insurance (Oct. 1984) pp. 3-24.) Available information indicates that this crisis has affected obstetricians keenly. (See generally, Bulger & Rostow, *Medical Professional Liability and the Delivery of Obstetrical Care* (1990) 6 J. of Contemp. Health L. and Pol'y 81.) "[T]he problem of professional liability adversely affects the delivery of obstetrical services, especially to disadvantaged women, those living in rural areas, and those with high-risk pregnancies." (*Id.,* at p. 83.) Such adverse effects have been documented specifically in California. (See generally, Professional Liability Issues in Obstetrical Practice, Bur. of Research & Planning, Cal. Medical Assn., XXV Socioeconomic Report (July/Aug. 1985); Professional Liability Issues in Obstetrical Practice (Part 2), Bur. of Research & Planning, Cal. Medical Assn., XXV Socioeconomic Report (Oct./Nov. 1985).)

In light of these observations, we realize that the imposition of liability in cases such as the one at hand may impose certain societal costs. For several reasons, however, we believe that the impact of our decision recognizing Burgess's claim against Gupta for damages for emotional distress will not unduly burden the community or health care providers in the field of obstetrics or result in the imposition of damages disproportionate to fault.

First, our Legislature has taken action to alleviate the "crisis" in medical malpractice liability and insurance by enacting the Medical Injury Compensation Reform Act of 1975 (Stats. 1975, chs. 1, 2, pp. 3949-4007) (hereafter MICRA). As a result of MICRA, the amount of "noneconomic damages," such as damages for emotional distress, that may be recovered in an action arising from the professional negligence of a health care provider is capped at $250,000. (Civ. Code, § 3333.2.) Because the Legislature has expressly considered and taken action to ameliorate the impact of increasing costs of liability coverage for health care providers, we are reluctant to further limit recovery in a situation where a plaintiff has suffered a foreseeable injury in the context of her physician-patient relationship.

Second, MICRA has established a restrictive statute of limitations for medical malpractice claims brought by adults. (Code Civ. Proc., § 340.5.) With certain narrow exceptions, no cause of action for medical malpractice may be brought by an adult later than "three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence, should have discovered, the injury, whichever occurs first." (*Ibid.*)

Thus, in the context of labor and delivery, the potential for long-delayed liability for emotional distress and the difficulty of defending against an action for such intangible damages many years after they occurred is slight.

Third, the class of potential plaintiffs in these cases is clearly limited. The only potential plaintiffs are pregnant women with whom the defendant has established a physician-patient relationship. Contrary to Gupta's assertions, there is no possibility, much less a specter, of unlimited liability presented by these unique cases.

■ Finally, we concur with Gupta that Burgess's potential damages for her emotional distress are limited by the public policy concerns supporting this court's decision to prohibit claims for loss of filial consortium. However, we reject Gupta's argument that Burgess must be completely barred from recovering damages for her emotional distress because those damages are essentially coextensive with damages that are properly asserted in a claim for loss of filial consortium.

It is well established in this state that parents may not recover damages for loss of filial consortium. (*Baxter* v. *Superior Court* (1977) 19 Cal.3d 461 [138 Cal.Rptr. 315, 563 P.2d 871].) Reasons of public policy explain why such a cause of action is not recognized, including: "[t]he intangible character of the loss, which can never really be compensated by money damages; the difficulty of measuring damages; the dangers of double recovery of multiple claims and of extensive liability. . . ." (*Id.* at p. 464.)

We are not persuaded, however, that this rule completely bars all of the damages for emotional distress that Burgess might have suffered. While some portion of Burgess's emotional distress may have arisen from her loss of Joseph's consortium, other portions of her emotional distress may have separate, distinct origins that would not subject damages for these portions of her emotional distress to a bar mandated by the policy concerns underlying the prohibition of the loss of filial consortium claim. Thus, we hold that damages arising from loss of Joseph's affection, society, companionship, love and disruption of Burgess's "normal" routine of life to care for Joseph cannot be recovered by Burgess no matter how her claim for these damages is denominated. (*Baxter* v. *Superior Court, supra,* 19 Cal.3d at p. 466; *Martinez* v. *County of Los Angeles, supra,* 186 Cal.App.3d at pp. 893-895.) We believe that this limitation on recovery eliminates the possibility of duplicative recovery by Burgess for damages which may be recovered by her child. We further hold to the extent, however, that Burgess's emotional distress arose from the "abnormal event" of participating in a negligent delivery and reacting to the unexpected outcome of her pregnancy with

resulting " 'fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation and indignity, as well as physical pain' " (*Thing, supra,* 48 Cal.3d at pp. 648-649, quoting *Deevy* v. *Tassi* (1942) 21 Cal.2d 109, 120 [130 P.2d 389]) resulting from defendant's breach of duty, then Burgess's emotional distress is of the type for which we have previously recognized recovery should be provided and is distinguishable from the type of emotional distress for which recovery is prohibited by virtue of the policy considerations underlying the prohibition of filial consortium claims.

We trust the ability of the trial courts to stringently enforce the limitation on damages in cases of this type through appropriate evidentiary rulings and jury instructions.

## III. Disposition

For the reasons set forth herein, we hold that Burgess is not required to satisfy the criteria for recovery as a bystander and may state a claim for damages for serious emotional distress arising from the negligent delivery of her child. Burgess's recovery, however, may not include damages for emotional distress arising from loss of Joseph's affection, society, companionship, love, and disruption of the "normal" routine of life to care for Joseph, but rather is limited to damages for her emotional distress arising from the "abnormal event" of participating in a negligent delivery and reacting to the tragic outcome with fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation and indignity, physical pain, or other similar distress.

Therefore, the judgment of the Court of Appeal is modified to direct the superior court, in addition to reversing its order of summary adjudication, to enter an order in accordance with the views expressed herein.

Lucas, C. J., Kennard, J., Arabian, J., Baxter, J., and George, J., concurred.

**MOSK, J.,** Concurring.—I concur in the holding of the majority opinion and in general in its rationale.

However, I cannot acquiesce in the majority's gratuitous limitation of our decision in *Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 167, 616 P.2d 813]. The majority mount unnecessary and uncalled-for criticism of *Molien,* copied largely from the misguided analysis of *Molien* in the majority opinion in *Thing* v. *La Chusa* (1989) 48 Cal.3d 644, 658-660

[257 Cal.Rptr. 865, 771 P.2d 814]. Because the *Thing* majority misread *Molien* (see my dissent in *Thing, supra,* at pp. 678-679), so too do the majority here.

Compounding the error, the majority assert there is a "perception" that *Molien* introduced a new method for determining duty, "limited only by the concept of foreseeability"; and the majority gratuitously conclude, "To the extent that *Molien* . . . stands for this proposition, it should not be relied upon and its discussion of duty is limited to its facts." (Maj. opn., *ante,* p. 1074.) But *Molien* does not "stand" for any such proposition, and the majority's proposed limitation of *Molien* thus collapses in a legal vacuum.

Elsewhere in their opinion the majority cite *Thing* with apparent approval for several other propositions. I cannot join in giving that decision any weight at all: in my view it was a judicial aberration. Because *Thing* is not actually in point—it was a "bystander" case, not a "direct victim" case—I need not reiterate here the defects in the *Thing* majority opinion discussed at length in my dissent (48 Cal.3d at p. 677) and that of Justice Broussard (*id.* at p. 682). I will recall only my observation in *Thing* that in disregard of the principle of stare decisis the majority there proceeded to "recite a monotonous inventory of cases with which they find fault. For the past three decades apparently all the courts in tort cases have been out of step except the current majority." (48 Cal.3d at p. 677, fn. omitted.) An opinion displaying the judicial arrogance of the *Thing* majority does not merit citation as authority.

Nevertheless, the majority here manage to recoup by recognizing the "sound" principle of *Molien* that "a cause of action to recover damages for negligently inflicted emotional distress will lie, notwithstanding the criteria imposed upon recovery by bystanders, in cases where a duty arising from a preexisting relationship is negligently breached." (Maj. opn., *ante,* p. 1074.) Here the preexisting relationship between defendant and plaintiff—i.e., the relationship of obstetrician and patient—gave rise to a duty of care that defendant owed both to plaintiff and to the child she was carrying. And as the majority correctly hold, it is plainly foreseeable that a negligent delivery resulting in severe permanent injuries to the child will cause its mother serious emotional distress, and hence result in liability on this theory. Indeed, that was the point of Justice Broussard's dissent in *Thing, supra,* 48 Cal.3d at page 682: he maintained, very simply, that "foreseeability and duty determine liability . . . . There is no reason why these general rules of tort law should not apply to negligent infliction of emotional distress actions."

Because the majority opinion is ultimately consistent with the principles of *Molien* and the dissents in *Thing*, I concur in its result.