Yvonne Marie COLBURN and Mark Colburn, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 97–0619–IEG LAB.

United States District Court, S.D. California.

Aug. 6, 1998.

Richard Scott Benjamin, R. Scott Benjamin, San Diego, CA, for plaintiffs.

Alan D. Bersin, U.S. Attorney, Thomas B. Reeve, Jr., Steven J. Poliakoff, Asst. U.S. Attys., U.S. Attorney's Office, Civil Div., San Diego, CA, for U.S.

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION AND GRANTING DEFENDANT'S MOTION TO DISMISS [Doc. No. 13]**

GONZALEZ, District Judge.

### BACKGROUND

On April 8, 1997, plaintiffs Yvonne Marie Colburn ("Mrs. Colburn") and Mark Colburn ("Mr. Colburn") filed a complaint under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671, 1346(b), 1367, 1402(c), seeking money damages and demanding a jury trial. In the complaint, plaintiffs raise the following claims for relief: (1) Mr. and Mrs. Colburn's wrongful death claim for Austin Colburn; (2) Mr. and Mrs. Colburn's wrongful death claim for Wyatt Colburn; (3) Mrs. Colburns' negligent infliction of emotional distress ("NIED") claim; (4) Mr. Colburn's NIED claim; (5) Mr. Colburn's loss of consortium claim; and (6) Mr. and Mrs. Colburn's negligent spoliation of evidence claim. Mrs. Colburn seeks damages in the amount of $750,000 and Mr. Colburn seeks damages in the amount of $500,000.

## A. Factual Background

The events giving rise to plaintiffs' claims occurred on October 24, 1994. On that date, at approximately 1:00 a.m., Mr. and Mrs. Colburn arrived at Balboa Naval Hospital reporting a twenty-three week twin pregnancy. Mrs. Colburn complained of irregular contractions. Thereafter, at 1:53 a.m., Lt. Pamela Ambroz Rice, M.D. ("Dr.Rice"), the senior resident on duty, conducted a vaginal examination.[1] Dr. Rice determined that Mrs. Colburn was fingertip dilated. Dr. Rice performed subsequent vaginal examinations at about 2:47 a.m. and 3:15 a.m. In addition, Mrs. Colburn received oral and intravenous hydration to hydrate her and to decrease the frequency of her contractions. Despite these efforts, Mrs. Colburn continued to have intermittent contractions. At 6:00 a.m., Mrs. Colburn left the hospital with instructions to return to the hospital in three to four hours for another examination.[2]

At approximately 8:30 a.m., Mr. and Mrs. Colburn returned to the hospital. Upon examination, it was determined that Mrs. Colburn was six centimeters dilated and completely effaced. Tocolytics, a medication used to stop premature labor, was administered to Mrs. Colburn in an effort to delay labor and the delivery of the twins.

Prior to the twins' births, a doctor advised Mr. and Mrs. Colburn that the twins' premature births would likely result in death or severe retardation. Mr. and Mrs. Colburn orally consented to a "do not intervene" instruction, which authorized the hospital not to medically intervene after

1. A factual dispute exists regarding what treatment Mrs. Colburn received before 1:53 a.m. Plaintiffs contend that she was not evaluated until 1:53 a.m., while the government claims that medical personnel immediately began to render care to her.

2. Plaintiffs contend that Dr. Rice "pulled rank" on Mr. Colburn, who was on active duty at the time, and ordered plaintiffs to leave the hospital despite plaintiffs' protest to stay. (Decl. of R. Scott Benjamin; Ex. 10,

the twins' births.[3] Subsequently, Mrs. Colburn gave birth to the twins. Mr. and Mrs. Colburn held the babies and noted that the twins had difficulty breathing and were "gasping for air." (Decl. of R. Scott Benjamin; Ex. 10, Deposition of Mrs. Colburn at 96.) The twins died three hours after birth.

## B. Procedural Background

On October 3, 1996, plaintiffs sought administrative remedies, asserting that Dr. Rice was negligent for not foreseeing that Mrs. Colburn would begin premature labor and for not giving her drugs that might have suppressed the contractions. Plaintiffs filed suit in this Court on April 8, 1997.

On July 7, 1998, the government filed the instant motions to dismiss and for summary adjudication against plaintiffs. The government seeks: (a) summary adjudication of Mrs. Colburn's claims for wrongful death; (b) summary adjudication, or alternatively, dismissal of Mr. Colburn's wrongful death claim; (c) dismissal of Mr. Colburn's NIED claim; (d) dismissal or summary adjudication of Mr. and Mrs. Colburn's spoliation claim; and (e) confirmation of the applicability of the California Medical Injury Compensation Reform Act's ("MICRA") limitation on noneconomic damages. In their opposition, plaintiffs agree to voluntarily dismiss Mr. and Mrs. Colburn's spoliation claim and Mr. Colburn's wrongful death claims. Furthermore, at oral argument, Mr. Colburn agreed to voluntarily dismiss his NIED claim. Accordingly, the Court **DISMISSES WITH PREJUDICE** Mr. and Mrs.

Deposition of Mrs. Colburn at 82.) The government states that Dr. Rice permitted Mrs. Colburn to go home with the specific instruction to return in three to four hours for another examination. (Reply; Ex. E, Deposition of Dr. Rice at 235.)

3. It is disputed whether the "do not intervene" instruction was confirmed after the twins' birth.

Colburn's spoliation claim and **DISMISS-ES WITH PREJUDICE** Mr. Colburn's claims for wrongful death and for NIED.

## DISCUSSION

### A. Jurisdiction

The Court has subject matter jurisdiction over the instant action under the FTCA. The FTCA provides that "the district courts ... shall have exclusive jurisdiction of civil actions or claims against the United States ... for death caused by the negligent or wrongful act or omission of any employee of the Government while acting in the scope of his office or employment." 28 U.S.C. § 1346(b)(1). In the instant action, plaintiffs allege that Dr. Rice, an employee of the United States of America, caused the deaths of their babies. Therefore, the Court has the authority to hear the instant action.

### B. Summary Adjudication of Wrongful Death Claims

#### 1. Legal Standard

The Court may grant summary adjudication when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering these motions, the Court must examine all the evidence in the light most favorable to the nonmoving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

If the moving party does not bear the burden of proof at trial, that party may then discharge the burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In particular, the moving party is entitled to summary judgment if the nonmovant fails to make a sufficient showing of an element of its case with respect to which it has the burden of proof. *See id.* at 323, 106 S.Ct. 2548.

Once the moving party meets the requirements of Rule 56 by either showing that no genuine issue of material fact remains or that there is an absence of evidence to support the nonmoving party's case, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party opposing a properly supported motion for summary judgment may not "rest on mere allegations or denials of his pleadings," *id.*, but must go beyond the pleadings to designate specific facts showing the existence of genuine issues for trial, *see Celotex*, 477 U.S. at 324–25, 106 S.Ct. 2548. A genuine issue exists when a reasonable jury could return a verdict for the nonmoving party. *See Anderson*, 477 U.S. at 247–49, 106 S.Ct. 2505.

#### 2. Analysis

■■■■ Under the FTCA, California law controls on the issue of liability. *See* 28 U.S.C. § 1346; *Garcia v. United States*, 826 F.2d 806, 809 (9th Cir.1987). A claim for wrongful death has, as necessary elements, all the traditional elements of negligence, i.e., duty, breach of duty, causation, and damage. *See Marlene F. v. Affiliated Psychiatric Med. Clinic Inc.*, 48 Cal.3d 583, 588–90, 257 Cal.Rptr. 98, 770 P.2d 278 (1989). The government contends that summary adjudication must be granted with respect to Mrs. Colburn's claims for wrongful death because the government provided the reasonable standard of care prior to the twins' births, and Mrs. Colburn's "do not intervene" instruction constituted superseding conduct that broke the chain of causation between the government and the twins' deaths. In opposition, Mrs. Colburn argues that the twins' deaths occurred because Dr. Rice breached the

reasonable standard of care in her treatment prior to the twins' birth.

### a. Standard of Care Prior to Twins' Births

■ "The courts require only that physicians and surgeons exercise in diagnosis and treatment that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of the medical profession under similar circumstances." *See Burgess v. Superior Ct.*, 2 Cal.4th 1064, 1081, 9 Cal.Rptr.2d 615, 831 P.2d 1197 (1992). Thus, a physician breaches the standard of care only if the physician action is "some deviation from the standard of care that his peers consider appropriate in the situation." *Id.* A plaintiff must convince the trier of fact that the physician's peers would consider his or her act to be blameworthy to constitute a breach of the reasonable standard of care. *See id.*

■ The government contends that the standard of care administered to Mrs. Colburn prior to the twins' births was reasonable and did not cause their subsequent deaths. With respect to the administration of tocolytics, the government's expert, Dr. William Rayburn ("Dr. Rayburn"), opined that its use would have only temporarily diminished Mrs. Colburn's contractions, and that this limited time, "most probably hours or days," would have had limited significance on a pregnancy that was less than 24 weeks. (Reply; Ex. F, Deposition of Dr. Rayburn ("Dr. Rayburn Depo.") at 69.) With respect to sending Mrs. Colburn home at 6:00 a.m., Dr. Rayburn stated in his deposition that Dr. Rice's decision to send Mrs. Colburn home for three to four hours was not below the reasonable standard of care. (Dr. Rayburn Depo. at 96.) Furthermore, Dr. Rayburn stated that Dr. Rice "exercised good judgment in making sure the patient understood that she needed to come back within just a short time to reassess things." (Dr. Rayburn Depo. at 80.)

In contrast, Mrs. Colburn's medical expert, Dr. Jeffrey P. Phelan ("Dr. Phelan") asserts, in his report, that the government's care to Mrs. Colburn was "unacceptable and a deviation from accepted standards of obstetrical care ... [and] ... in all medical probability contributed to or caused the preterm birth[s] of ... [the twins] and their subsequent deaths." (Decl. of R. Scott Benjamin; Ex. 8, Report of Dr. Phelan at 1.) With respect to the administration of tocolytics, Dr. Phelan opined that the failure to use tocolytics before Mrs. Colburn's release at 6:00 a.m. was below the reasonable standard of care. (Benjamin Decl; Ex. 9, Deposition of Dr. Phelan ("Dr. Phelan Depo.") at 147.) Furthermore, he stated that had tocolytics been administered, Mrs. Colburn's pregnancy "should have been prolonged" long enough to give birth to twins that could have lived a meaningful life. (Dr. Phelan Depo. at 150.)

With respect to sending Mrs. Colburn home at 6:00 a.m., Mrs. Colburn provides evidence to support her contention that sending her home was below the standard of reasonable care. Dr. Phelan stated in his deposition, "when she was sent home, I thought it fell within conscious disregard." (Dr. Phelan Depo. at 187.) He stated that the hospital should have kept Mrs. Colburn at the hospital for observation because it was a "known risk that upon discharge children could be delivered prematurely." (*See id.*) Furthermore, Mrs. Colburn stated that she was unable to walk out of the hospital and did not want to go home because of her condition. (Benjamin Decl.; Ex. 9, Deposition of Yvonne Colburn ("Mrs. Colburn's Depo.") at 83.) Based on the foregoing, Mrs. Colburn provides evidence to support her contention that the government breached the reasonable standard of conduct. Therefore, a genuine issue of material fact exists with respect to this issue.

### b. Causation and Superseding Conduct After Twins' Births

■ In a medical malpractice claim, causation must be proved by a reasonable

medical probability based upon competent expert testimony. *See Jones v. Ortho Pharmaceutical Corp.*, 163 Cal.App.3d 396, 401, 209 Cal.Rptr. 456 (1985). Superseding conduct, as set forth in the Second Restatement of Torts, breaks the chain of causation under California law. *See Stewart v. Cox*, 55 Cal.2d 857, 864, 13 Cal.Rptr. 521, 362 P.2d 345 (1961). The Restatement provides: "a superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." Restatement (Second) of Torts § 404.

■ The government alleges that Mrs. Colburn's agreement to a "do not intervene" instruction was a superseding force that broke the chain of causation between the government's actions and the twins' deaths. Because the superseding conduct was not committed by a third person, traditional standards of superseding forces do not apply. Thus, the government contends that California Civil Code § 3515 authorizes summary adjudication. Section 3515 provides: "he who consents to an act is not wronged by it." The government argues that if Mrs. Colburn consented to the "do not intervene" instruction, which the government maintains caused the twins' deaths, the government cannot be held liable for the twins' deaths.

The government provides the following evidence in support of its argument. First, Mrs. Colburn agreed to the "do not intervene" instruction when she stated that "we felt like if we kept the babies alive it would only be for ourselves ... so we said that if they couldn't survive they should let them die by natural means." (Mrs. Colburn's Depo at 93.) Second, plaintiffs' expert Dr. Phelan stated that based on his "training, skill, and experience in regard with dealing with delivery

issues [and] 600 gram infants" the twins, who were 600 grams, were born viable and should have survived with medical intervention. (Dr. Phelan's Depo. at 182.) Finally, Dr. Phelan opines that it was his "understanding that you're not suppose to" resuscitate premature infants contrary to parental wishes. (Dr. Phelan's Depo. at 187.)

In opposition, Mrs. Colburn asserts that her "do not intervene" instruction was conditional, and only to be followed if the twins were not viable.[4] Mrs. Colburn also argues that she was not given accurate information to formulate an informed consent. Because the twins were born viable, Mrs. Colburn contends that the government should have provided medical care to the twins. First, Mrs. Colburn states, in her deposition, that a doctor "explained to [her] that if the babies weren't old enough, they would probably die" or suffer severe retardation or blindness. (Mrs. Colburn's Depo. at 90, 92.) Thus, Mrs. Colburn decided that "if [the twins] couldn't survive, they should die by natural means." (Mrs. Colburn's Depo. at 93 (emphasis added).) Second, Dr. Phelan opined that the twins "in all medical probability should have survived." (Dr. Phelan's Depo. at 182.) Thus, Mrs. Colburn provides evidence in support of her contention that the hospital should not have followed her "do not intervene" instruction because the twins were viable at birth.

In addition, Mrs. Colburn argues that the government's breach of the reasonable standard of care in treating her prior to the twins' births caused the twins' deaths. Mrs. Colburn cites to Dr. Phelan's Deposition in support of her proposition. Dr. Phelan opined:

[T]he administration of tocolytics (medications used to stop premature labor) in the early morning hours of 24 October 1995 would, in all medical probability,

4. The government argues that Mrs. Colburn's Deposition and Declaration are inconsistent. The Court finds that Mrs. Colburn's Deposition is sufficiently consistent with her Declaration for the purposes of this motion. Therefore, the Court **OVERRULES** the government's objection.

have prolonged Yvonne Heuston Colburn's twin pregnancy. [If] the tocolytics [had] been administered, we would have had a minimum of three days. When you're dealing with low birth weight, such as these twins, one day makes a difference in the outcome of the child.

(Dr. Phelan Depo. at 146–47.) Thus, a genuine issue of material fact exists with regards to the cause of the twins' deaths. Accordingly, the Court **DENIES** the government's motion for summary adjudication.

## C. MICRA

▇▇▇ Under the terms of the FTCA, the measure of damages in FTCA cases are generally based on the law of the state where the tort occurred. *See Shaw v. United States,* 741 F.2d 1202, 1205 (9th Cir.1984). The MICRA legislation, as embodied in Cal.Civ.Code § 3333.2(b), provides: "In no action shall the amount of damages for noneconomic losses exceed two hundred fifty thousand dollars ($250,-000)." Cal.Civ.Code § 3333.2(b). The government contends that under MICRA, a single plaintiff can recover a maximum of $250,000 in noneconomic damages, regardless of the number of claims the plaintiff alleges. In opposition, plaintiffs argue that the $250,000 maximum for noneconomic damages applies to each individual claim.

Neither the California Supreme Court nor the appellate courts have ever held that a single plaintiff can recover more than the MICRA limit for noneconomic damages. To the contrary, the courts have consistently limited the maximum recovery to $250,000, regardless of the number of claims alleged. *See Fein v. Permanente Med. Group,* 38 Cal.3d 137, 157–64, 211 Cal.Rptr. 368, 695 P.2d 665 (1985) (approving a reduction of noneconomic damages to $250,000 when multiple diagnostic errors occurred); *Atkins v. Strayhorn,* 223 Cal.App.3d 1380, 1394, 273 Cal. Rptr. 231 (1990) (limiting a husband and

wife to $250,000 each for noneconomic damages); *Yates v. Pollock,* 194 Cal. App.3d 195, 200, 239 Cal.Rptr. 383 (1987) (finding that the "maximum recovery [for noneconomic damages] permitted in any single medical malpractice action is $250,-000, regardless of the number of plaintiffs involved"); *Engalla v. Permanente Med. Group,* 15 Cal.4th 951, 987, 64 Cal.Rptr.2d 843, 938 P.2d 903 (1997) (observing that a single plaintiff with a claim for wrongful death and loss of consortium was limited to an aggregate maximum potential recovery of $250,000 for all noneconomic damages).

Mrs. Colburn argues that MICRA's limitation should apply to each of her claims, thus allowing a potential recovery of $750,-000 for her three remaining claims for wrongful death and NIED. Mrs. Colburn asserts that *Burgess v. Superior Court,* 2 Cal.4th 1064, 1071, 9 Cal.Rptr.2d 615, 831 P.2d 1197 (1992), allows such a recovery because there, the California Supreme Court held that a mother could recover for negligence, emotional distress, and wrongful death. *Id.* at 1071, 9 Cal.Rptr.2d 615, 831 P.2d 1197. However, the *Burgess* Court did not address the issue of MICRA's applicability to recovery under these claims. Thus, the holding in Burgess is inapposite and does not support Mrs. Colburn's argument.

Therefore, the Court finds that MICRA provides a $250,000 maximum aggregate recovery for a single plaintiff. Accordingly, Mr. and Mrs. Colburn have a combined maximum potential recovery of $500,000 for all noneconomic damages.

## CONCLUSION

For the reasons stated above, the Court **DENIES** the government's motion for summary adjudication on Mrs. Colburn's first and second claims for wrongful death and **DISMISSES WITH PREJUDICE** Mr. Colburn's first and second claims for wrongful death, Mr. Colburn's fourth claim for negligent infliction of emotional distress, and Mr. and Mrs. Colburn's sixth claim for spoliation. Furthermore, the

Court **FINDS** that, with respect to each plaintiff, MICRA limits the aggregate maximum recovery for all noneconomic damages to $250,000.[5]

**IT IS SO ORDERED.**

---

5.   The following claims remain in the action: Mrs. Colburn's first and second claims for wrongful death, Mrs. Colburn's third claim for negligent infliction of emotional distress, and Mr. Colburn's fifth claim for loss of consortium.