[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 702 
OPINION
Defendant Westminster Memorial Park challenges an award to plaintiff Kenneth Bruce Binns for emotional distress arising from plaintiff's discovery that defendant had negligently interred the remains of a stranger in a family burial plot intended for plaintiff. Defendant also challenges the sufficiency of the evidence to support the trial court's finding he suffered serious emotional distress. Finally, defendant contends emotional distress damages should not have been awarded because a reasonable person in plaintiffs situation would be able to adequately cope with the knowledge that a stranger had been buried in his or her burial plot.
We conclude defendant's interment of plaintiff's mother in a plot adjacent to the space reserved for plaintiff created a special relationship with plaintiff giving rise to a duty to avoid mistakenly interring a stranger in his plot. Because burying a stranger in a family plot adjacent to one's parents may engender intense feelings based on religious, emotional or ethical concerns, it is foreseeable serious emotional distress could result. We limit defendant's duty only to situations where at least one family member has been interred in the adjacent family plots. Consequently, the potential liability created by recognition of such a duty is not overly burdensome. We also conclude substantial evidence supported the trial court's determination plaintiff suffered serious emotional distress and that plaintiff's reaction to the situation was not so abnormal as to preclude recovery.
Plaintiff separately appeals the trial court's order denying him contractual attorney fees. Plaintiff contends the emotional distress award resulted from an action to enforce the terms of the contract his mother signed with defendant to obtain the family burial plots, and thus triggered the attorney fee clause in that agreement.
We conclude the trial court did not err in denying plaintiffs attorney fee request. Although defendant's duty to plaintiff arose in part from a contract, plaintiff's contract action did not seek to enforce any provision of the agreement. Accordingly, we affirm the judgment and order denying attorney fees.
 I
FACTUAL AND PROCEDURAL BACKGROUND
In 1977, plaintiff's mother purchased a burial plot for plaintiff's deceased father in defendant's cemetery. A few months later, plaintiff's mother purchased three additional plots adjacent to the plot in which plaintiff's father *Page 704 
was interred, intended for herself, plaintiff, and plaintiff's wife or, if plaintiff did not marry, plaintiffs brother. As part of the transaction, plaintiff's mother executed a purchase agreement with defendant. Plaintiffs mother died in 1986 and was interred in the plot next to plaintiff's father.
On Easter 2005, plaintiff visited his parents' graves and discovered a stranger, Maria Vallejo, buried in the plot immediately adjacent to his mother, which had been reserved for plaintiff. Plaintiff immediately brought the situation to the attention of Lydia Navas, defendant's family services counselor, who reviewed some records and promised to obtain further information. The following day, Navas contacted plaintiff, confirmed Vallejo had been buried in plaintiffs plot, and promised to rectify the problem. A few days later, Navas again contacted plaintiff to inform him the cemetery had removed Vallejo from plaintiff's plot and reinterred the corpse in another location. Defendant had not notified plaintiff it would disturb Vallejo's remains to rectify the situation.
Defendant maintained two files reflecting plot sales, a "block file" reflecting sales in a particular area of the cemetery and a "Card-ex file," reflecting the individual sales. Defendant resold plaintiff's plot to the Vallejo family because it incorrectly recorded the sale of the Binns family plots in the block file. At the time of Vallejo's interment, defendant relied exclusively on the "block file" to determine whether a grave was available for interment.
Plaintiff sued defendant for breach of contract and negligent infliction of emotional distress. Defendant moved for judgment on the pleadings, which the trial court denied. The case proceeded as a bench trial. At the close of plaintiff's case, defendant moved for nonsuit, which the court again denied. After trial concluded, the court awarded plaintiff judgment of $4,440. The court denied plaintiff's attorney fee request because plaintiff's recovery was "not for enforcement of the agreement . . ., [but] basically for emotional distress for negligence." Defendant now appeals the judgment and plaintiff appeals the trial court's order denying attorney fees.
 II DISCUSSION
A. Defendant Owed Plaintiff a Duty Not to Bury a Strangerin His Plot
In awarding plaintiff emotional distress damages, the trial court relied exclusively on plaintiff's cause of action for negligent infliction of emotional *Page 705 
distress. Damages for severe emotional distress are recoverable in a negligence action "when they result from the breach of a duty owed the plaintiff that is assumed by the defendant or imposed on the defendant as a matter of law, or that arises out of a relationship between the two." (Marlene F. v. Affiliated Psychiatric Medical Clinic,Inc. (1989) 48 Cal.3d 583, 590 [257 Cal.Rptr. 98,770 P.2d 278] (Marlene F.).) Defendant contends plaintiffs claim fails because it did not owe plaintiff a duty to prevent the temporary burial of Vallejo in his burial plot. We disagree.
Civil Code section 1714, subdivision (a), presents the general rule concerning a person's legal responsibility to others: "Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself." The Supreme Court has observed that "`[i]n the absence of a statutory provision limiting this rule, exceptions to the general principle imposing liability for negligence are recognized only when clearly supported by public policy.'" (Burgess v. Superior Court (1992)2 Cal.4th 1064, 1079 [9 Cal.Rptr.2d 615, 831 P.2d 1197].)
Generally, nonstatutory limitations on legal duty turn on (1) the reasonable foreseeability of the risk of injury, and (2) a weighing of policy considerations for and against imposition of liability. (Marlene F., supra, 48 Cal.3d at p. 588;Erlich v. Menezes (1999) 21 Cal.4th 543, 552
[87 Cal.Rptr.2d 886, 981 P.2d 978].) In elaborating upon the relationship between these two elements, the court inQuesada v. Oak Hill Improvement Co. (1989)213 Cal.App.3d 596, 608 [261 Cal.Rptr. 769] (Quesada) explained that "although the court . . . utilize[s] foreseeability to begin a determination of duty, the final determination . . . is tempered by policy considerations."
The seminal case of Rowland v. Christian (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561] set forth the major factors in determining the scope of a person's legal duty: "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (Id. at pp. 112-113.) *Page 706 
In Quesada, the defendant funeral home showed the body of a stranger to the decedent's family and buried it in the decedent's plot despite the family's protests that the body was not the decedent. [Quesada, supra,213 Cal.App.3d at p. 600.) Following- traditional tort analysis, the court noted that in the absence of overriding policy considerations, an objective determination of the foreseeability of risk is of primary importance in establishing the element of duty. (Id. at p. 604.) The court concluded the injury to close friends and relatives from the misplacement of the deceased's body and the "improper treatment of another" was foreseeable because parties charged with the care, custody, and control of the remains of a deceased should know that their friends and relatives are emotionally vulnerable and preoccupied with concern over the disposition of the body. (Id. at p. 605.) Tempering liability based on foreseeability with relevant policy considerations, the court limited the class of potential plaintiff's to close family members to avoid expansive liability. (Id. at p. 609.)
In Christensen v. Superior Court (1991) 54 Cal.3d 868
[2 Cal.Rptr.2d 79, 820 P.2d 181] (Christensen), decided two years after Quesada, the mortuary defendants contracted with the cemetery defendants to perform cremations. The cemetery defendants mishandled the decedents' remains. The defendant mortuaries knew or should have known of the cemetery's malfeasance. (Christensen, at pp. 878-879.) The Supreme Court held family members could recover emotional distress damages because the mortuaries and crematories owed them an independent tort duty arising from a special relationship. (Id. at p. 891.) The court recognized that "`[o]nce a mortuary . . . undertakes to accept the care, custody and control of the remains, a duty of care must be found running to the members of decedent's bereaved family.'" (Id. at pp. 887-888.)
The Christensen court determined it was foreseeable that mishandling human remains likely would cause serious emotional distress to members of the decedent's immediate family. In reaching this conclusion, the court cited with approval Allen v. Jones (1980) 104 Cal.App.3d 207, 211
[163 Cal.Rptr. 445] (Allen.) There, the defendant mortuary contracted to ship the remains of the plaintiffs decedent brother to another state, but lost the remains in transit. The Court of Appeal in Allen observed: "A contract whereby a mortician agrees to prepare a body for burial is one in which it is reasonably foreseeable that breach may cause mental anguish to the decedent's bereaved relations. `One who prepares a human body for burial and conducts a funeral usually deals with the living in their most difficult and delicate moments. . . . The exhibition of callousness or indifference, the offer of insult and indignity, can, of course, inflict no injury on the dead, but they can visit agony akin to torture on the living. So true is this that the chief asset of a mortician and the *Page 707 
most conspicuous element of his advertisement is his consideration for the afflicted. A decent respect for their feelings is implied in every contract for his services.' [Citation.] . . . `The tenderest feelings of the human heart center around the remains of the dead.'" (Id. at p. 211.)
In contrast to the situation in Christensen, the present case does not directly involve the handling of the remains of a deceased member of plaintiff's family or the provision of mortuary services. Moreover, defendant's error here occurred long after his parents had died, and not at plaintiff's "`most difficult and delicate moments.'" (Allen,supra, 104 Cal.App.3d at p. 211.) In considering whether emotional distress is foreseeable in the present circumstance, we have little analogous case law to guide us. Indeed, the parties have cited no California cases with similar facts.
The closest case factually from another jurisdiction we have found is Angiolillo v. Buckmiller (2007)102 Conn.App. 697 [927 A.2d 312] (Angiolillo), where the defendant funeral home negligently buried the decedent's cremated remains in an eight-inch by eight-inch hole at the head of his mother's cemetery plot without the permission of the plaintiffs, the decedent's nephew and his wife, who owned the mother's plot and three adjacent plots. Rejecting the plaintiffs' claim for negligent infliction of emotional distress, theAngiolillo court noted the funeral home followed the wishes of the decedent's widow, and mistakenly believed it had received permission from the appropriate family members for the burial. The court concluded: "It was not foreseeable that the plaintiff would have such a strong objection to his uncle's cremains being buried there. Additionally, `[a]n individual making an emotional distress claim must show that areasonable person would have suffered emotional distress . . . that . . . might result in illness or bodily harm. . . . ` . . . [Citation.] In this case, the plaintiffs were not able to prove that a reasonable person would have reacted as they did. The burial of the cremains of the decedent did not interfere with the two grave sites reserved for the plaintiffs, and as soon as the . . . defendants learned of the plaintiffs' objection, the cremains were removed and buried in another portion of the cemetery." (927 A.2d at p. 321.)
Thus, Angiolillo presents many similarities with the present case, but also some key differences. Here, like inAngiolillo, the defendant corrected the problem as soon as it was brought to its attention. UnlikeAngiolillo, however, Vallejo's burial interfered with plaintiff's future burial site, and the disruption to the site was far greater than the small hole placed in the mother's plot in Angiolillo. Moreover, Vallejo was not a family member, and defendant did not bury Vallejo's remains under the mistaken belief the plot *Page 708 
owner had consented. Family members purchase adjacent burial plots to relieve worry or anxiety about whether they will be buried next to their loved ones. In contrast to an ordinary plot of land, most people attach religious, spiritual, or emotional significance to their gravesite, and many consider it sacred. As one treatise notes: "The sentiment of all civilized peoples regards the resting place of the dead as hallowed ground and requires that in some respects it be not treated as subject to the laws of ordinary property."[1] (14 Am.Jur.2d (2000) Cemeteries, § 31; see also Laurel H.Cemetery Assn. v. San Francisco (1947) 81 Cal.App.2d 371
[184 P.2d 160] [describing property used for the burial of the dead as "sacred"].)
True, the accidental resale of an empty burial plot in many cases would not cause serious emotional distress. If the second purchaser inters remains in the resold plot, the cemetery may satisfy the first purchaser by offering a comparable unused plot. Indeed, the terms and conditions of defendant's purchase agreement recognize that the plots purchased may not be ready when the need for them arises. Specifically, the agreement provides: "In the event the purchaser desires to use the space purchased herein prior to the time it is ready for interment, then seller agrees to furnish other space of similar nature in a fully developed garden, at no extra cost." But once a cemetery operator inters the remains of one family member in one of several adjacent family plots, the specific location of the remaining plots becomes dramatically more important. In situations like the one here, the family member for whom the plot was purchased must choose (1) interment in a plot where someone else already had been laid to rest (here for 10 years), (2) interment in a plot separated from other family members, (3) interment in a plot *Page 709 
designated for a different family member, depriving that family member a place with the others, or (4) exhumation of the remains of predeceased family, members and reinterment in a location where all of their remains may be placed together. Although the issue is close, we conclude it is foreseeable a person could suffer severe emotional distress upon discovery a stranger had been buried in their family gravesite.
Having determined emotional distress was foreseeable, theChristensen court applied policy considerations to determine whether liability should accrue and if so, the scope of potential plaintiffs. In doing so, the court determined the defendants' "outrageous and reprehensible" behavior in stealing body parts and comingling remains was morally blameworthy. (Christensen, supra, 54 Cal.3d at p. 896.) The court also determined the burden and consequences to the community due to excessive litigation were minimal because the court limited the plaintiff's who could recover to close relatives who were aware the services were being performed and for whom the services were performed. (Id. at p. 898.) The court determined that this group of potential plaintiff's would not cause an intolerable burden upon mortuary and cemetery operators, and would not cause the costs to the consumer to increase, or the availability of services to decrease. Because the acts complained of were intentional, cemetery and mortuary operators could easily control their exposure. Finally, the court in Christensen determined the scope of potential liability imposed was not disproportionate because the scope of potential plaintiff's was limited to a specific group. (Id. at p. 900.)
In contrast to the conduct at issue in Christensen, defendant's mistake in incorrectly recording a plot sale in its block file is not morally reprehensible. Consequently, the scope of a cemetery's legal duty is narrower than the duty imposed in Christensen. But we have little difficulty including plaintiff within the class of potential plaintiffs. Though unintentional, defendant's negligent interment of a stranger in plaintiff's family burial plot compromised the purpose underlying the agreement between the family and the cemetery, i.e., the emotional tranquility arising from the cemetery's promise that plaintiff will be buried next to his loved ones. While other relatives may be upset to discover a stranger buried in a family plot, it is the intended user of the plot who is most likely to suffer emotional distress from the incident.
Imposing a duty on defendant in the present situation would further the goal of preventing future harm by encouraging cemetery operators to update their filing systems. The evidence in the present case demonstrated defendant was unable to catch their error in the block file system because a double check using their Card-ex system would require searching through approximately *Page 710 
50,000 plot sales. Using a computer-based system would allow easier checking, offering a simple means to prevent future harm that likely would not involve undue expense. Because the tort liability imposed here rests on negligence and not intentional conduct, insurance should cover any future liability from similar mistakes. Finally, we note that recognizing a duty here supports the principle that "[a]s a society we want those who are entrusted with the bodies of our dead to exercise the greatest of care." (Quesada,supra, 213 Cal.App.3d at 610.)
Accordingly, we hold that a cemetery operator, upon interment of the remains of one family member, undertakes a duty not to bury a stranger in one of these plots. Our holding is narrow; we do not consider any potential liability defendant may have to other members of plaintiff's family or to members of the Vallejo family, nor do we consider the situation where a stranger is buried in an already occupied plot. We therefore conclude the trial court did not err in denying defendant's motion for judgment on the pleadings and for nonsuit.
B. Plaintiff Introduced Sufficient Evidence of SevereEmotional Distress
In Thing v. La Chusa (1989) 48 Cal.3d 644, 667-668
[257 Cal.Rptr. 865, 771 P.2d 814], the California Supreme Court recognized that to obtain emotional distress damages, the plaintiff must "suffer[] serious emotional distress — a reaction beyond that which would be anticipated in a disinterested witness and which is not an abnormal response to the circumstances." Put another way, "[s]erious emotional distress is such that ` "a reasonable [person], normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case."' [Citations.] Thus, in determining whether emotional distress is serious, an objective standard is utilized." (Potter v.Firestone Tire Rubber Co. (1993) 6 Cal.4th 965, 989, fn. 12 [25 Cal.Rptr.2d 550, 863 P.2d 795].) Defendant contends plaintiff failed to demonstrate serious emotional distress because he presented no evidence of treatment by medical or mental health care professionals. We disagree.
"Emotional distress includes suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame." (CACI No. 1604; see also Black's Law Dict. (8th ed. 2004) p. 563 [defining emotional distress].) At trial, plaintiff presented evidence that when he discovered Vallejo's body buried in his own plot, he began trembling and felt as if he had been "struck by lightning." He was "horrified," believing he had been "spiritually violated." Plaintiff viewed the plot as having been desecrated because Vallejo's soul had been disturbed when she was moved from what was to have been her final resting place. As a result of defendant's error, *Page 711 
plaintiff testified he suffered from nightmares, loss of appetite, and cold sweats. Plaintiff testified he did not seek medical care because he could not afford it. Plaintiffs former employer, David Burton, testified at trial that before the incident, plaintiff had been a "phenomenal" salesman, and a skilled silversmith. Burton testified that after the incident, plaintiff's productivity deteriorated to the point that Burton could no longer leave plaintiff in the jewelry shop alone, explaining plaintiff was "not the same person that I knew for the last 18 years." This evidence demonstrates a sufficient level of emotional distress to support the award in the present case.
Defendant also challenges the emotional distress award on the basis that a reasonable person in plaintiff's situation would not suffer serious emotional distress when learning a stranger had been buried in his or her burial plot. Again, we disagree. More than situations involving physical danger, matters concerning the burial of the dead evoke a wide spectrum of responses from reasonable people depending on their cultural, historical, and religious beliefs and traditions. Although many people would not suffer serious emotional distress from seeing a stranger interred in their burial plot, we cannot say that plaintiff's response was so abnormal as to forbid recovery.
C. The Trial Court Did Not Err in Denying AttorneyFees
Plaintiff contends the trial court erred in denying him attorney fees under Civil Code section 1717 because the sales agreement for the plots contained an attorney fee provision. We disagree.
The purchase agreement between plaintiff's mother and defendant provided: "In the event it is necessary for seller to institute any legal proceedings for the enforcement of this agreement, or any of the terms and conditions thereof, then purchaser agrees to pay the seller a reasonable sum as attorney's fees hereof." Although the purchase agreement purports to grant attorney fees only to the seller of the plots, Civil Code section 1717 makes the fee provision reciprocal. Specifically, Civil Code section 1717, subdivision (a), provides, in relevant part: "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs."
In denying plaintiff's attorney fee request, the trial court noted plaintiff's recovery was "not for enforcement of the agreement . . ., [but] basically for emotional distress for negligence." Plaintiff disagrees with the trial court's assessment, arguing the special relationship giving rise to defendant's liability *Page 712 
"arose because Plaintiff was a third-party beneficiary to a cemetery contract with Defendant. But for the existence of this cemetery contract, the law would not recognize any duty owed to Plaintiff, and Plaintiff would have no right to recover on any theory of liability."
"A tort claim does not enforce a contract. [Citation.] Where a contract authorizes an award of attorney fees in an action to enforce any provision of the contract, tort claims are not covered." (Gil v. Mansano (2004) 121 Cal.App.4th 739,743-744 [17 Cal.Rptr.3d 420].) Moreover, a tort action "arising out of a contact is not . . . an action `on a contract' within the meaning of [Civil Code section 1717]." (Stout v.Turney (1978) 22 Cal.3d 718, 730 [150 Cal.Rptr. 637,586 P.2d 1228]; see Loube v. Loube (1998)64 Cal.App.4th 421, 430 [74 Cal.Rptr.2d 906] (Loube).)
In Loube, the trial court awarded attorney fees to the prevailing defendant in a legal malpractice action based on an attorney fee clause in the retainer agreement which provided: "`[I]f legal action or arbitration is necessary to enforce the terms of this Agreement, the prevailing party shall recover reasonable attorneys' fees.'" (Loube, supra,64 Cal.App.4th at p. 429.) The Court of Appeal reversed the fee award, noting: "[A]lthough the parties had a contractual relationship, and appellant's claim for legal negligence arose from the relationship between them, which relationship was founded on a contract, the cause of action sounded in tort and was no more `on the contract' than a claim for breach of fiduciary duty or for fraud involving a contract. It follows that Civil Code section 1717 provides no basis for an award of attorney fees." (Id. at p. 430.)
The attorney fee clause here tracks the language of the fee provision in Loube because it covers "legal proceedings for the enforcement of this agreement, or any of the terms and conditions hereof." (Italics added.) Although plaintiff is correct that the duty defendant owed plaintiff here would not have arisen absent the plot purchase agreement, this fact alone does not mean that any action based on a breach of that duty becomes an action to enforce the agreement. Indeed, the special relationship between defendant and plaintiff giving rise to the legal duty breached did not arise when the contract was formed, but when defendant received and interred the remains of plaintiff's mother.
In an effort to shoehorn the present situation into the attorney fee clause, plaintiff asserts he brought the present action to enforce a provision under the "Terms and Conditions" of the purchase agreement which provides: "[T]he seller, its agent or salesman will not resell or attempt to resell said interment property for the purchaser." As defendant points out, the clause covers only resales made "for the purchaser." The manifest purpose of this clause is to *Page 713 
disclaim any responsibility for reselling the plots on behalf of the purchaser where the purchaser no longer wanted them. Other than this term, plaintiff can point to no other provision of the purchase agreement he was attempting to enforce in this action. We therefore conclude the trial court did not err in denying plaintiff's fee request.
 III DISPOSITION
The judgment and order are affirmed. In the interests of justice, each side is to bear its own costs on appeal.
O'Leary, J., concurred.
[1] Our dissenting colleague sees this case as little more than an action for "mishandling real estate." (Dis. opn.,post, at p. 713.) We believe this trivializes the distinctive quality of family burial plots. We doubt most people would consider the presence of a burial plot adjacent to the gravesites of loved ones to be merely a real property transaction for the right to an easement. Indeed, the sacred nature of burial places is nearly universal among all religions. For example, a statement by Rabbi Lazar Stern of Athra Kadisha and Dr. Bernard Fryshman of the Conference of Academicians for the Protection of Jewish cemeteries explains: "[A] Jewish cemetery is sacred ground. Violating this ground through unearthing the dead is a sacrilege." (http://www.eworldwire.com/pressreleases/19266 [as of Feb. 26, 2009].) Similarly, the mission statement for the Saint Peters Restoration Cemetery Foundation describes the Catholic cemetery grounds as "a space where the veil between this world and the next is very thin. This is holy ground, the final resting place of thousands of people to be treated with reverence. [¶] . . . [T]his is also a sacred space for the living." (http://www.jonahhouse.org/StPeter'sCemeteryMission.htm
[as of Feb. 26, 2009] (italics omitted).) Before interment, members of the Church of Jesus Christ of Latter-day Saints (Mormon) church typically have a priesthood holder dedicate and consecrate the burial plot as the resting place for the body of the deceased. (Family Guidebook, Church of Jesus Christ of Latter-day Saints (2006).) No one should understand the sensitivity of these issues better than the funeral and burial profession.