Filed 8/17/16 Alkins v. Loma Linda University Medical Center CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| PRISCILLA ALKINS et al., | D069646 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. CIVDS1107283) |
| LOMA LINDA UNIVERSITY MEDICAL CENTER et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Bernardino County,

John M. Pacheco, Judge. Affirmed.

Law Offices of Kathryn P. Cooney and Kathryn P. Cooney; Switzer Law Office

and J. Edward Switzer, Jr., for Plaintiffs and Appellants.

Schilt & Heinrich and E. Nathan Schilt for Defendants and Respondents.

INTRODUCTION

Priscilla Alkins appeals from a judgment following a bench trial in favor of Loma

Linda University Medical Center (Loma Linda), in connection with medical care she

received after she went into premature labor with twins. During labor, one fetus

(Sebastian) passed away in utero. Alkins sued Dr. Rebecca Arthur and Loma Linda for medical negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress. Only negligent infliction of emotional distress is at issue in this appeal, but the trial court's other rulings provide context for our analysis.

The trial court concluded Dr. Arthur was not negligent and that Sebastian died of an infection. It also concluded the nursing care fell below the standard of care during a three-hour period when Alkins was leaking large amounts of amniotic fluid and she could not locate a nurse to assist her, but found this conduct did not contribute to Sebastian's death. Alkins herself did not suffer any physical injuries while receiving medical care.

On appeal, Alkins does not contest these findings or the court's conclusion she did not establish a claim for intentional infliction of emotional distress. Rather, she contends the court erred in denying her claim for emotional distress damages based on the nursing negligence. She challenges the court's determinations that her serious emotional distress was caused by concern for her fetuses, in the context of premature, prolonged labor and copious leaking, and that the three-hour absence of the nurses was not a substantial factor in causing this distress. Alkins asserts the evidence does not support these causation findings. Alkins also argues the court committed legal error by purportedly requiring that she demonstrate physical injury and that the nurses could have reduced the leaking. She maintains these elements are not necessary for recovery.

For reasons we shall explain, we conclude substantial evidence supports the trial court's factual causation finding. We further conclude the legal errors identified by

2

Alkins were harmless. The court's causation finding reflects the court viewed her worry over the fetuses, under the stressful circumstances at hand, as the source of her distress and was not persuaded the nursing negligence was the cause. Even if the court had not considered the lack of physical injury or the nurses' ability to mitigate the leaking, we are satisfied such factors would not have changed the court's findings.

In affirming the judgment, we are acutely aware that the grief Alkins suffered was profound and that the death of a child is always heartbreaking. But having carefully reviewed the record, we are satisfied the court did not err in concluding Alkins's serious emotional distress was not attributable to negligent care, but rather to the inherent stresses associated with her high-risk, premature childbirth.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

### I. *Overview*

On October 29, 2009, Alkins, who was pregnant with twins, was admitted to Inland Valley Hospital (Inland) for preterm labor. On October 30, a doctor informed her Inland was not equipped to handle premature births, and she was transferred by helicopter

---

[1]    We focus on the facts relevant to Alkins's claim for negligent infliction of emotional distress. We note her briefs address facts regarding the adequacy of her care at Loma Linda and the cause of Sebastian's death, but she does not indicate she is contesting the trial court's negligence rulings or provide legal authorities to do so. Thus, she has forfeited any such challenge. (*People v. Stanley* (1995) 10 Cal.4th 764, 793 (*Stanley*) [it is not the reviewing court's role to "construct a theory" for appellant: " '[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived . . . .' "], citations omitted.)

to Loma Linda.  At this point, she knew the transfer was to obtain care for her high-risk, premature twins and she was already concerned about the circumstances of her labor.  The next day, the amniotic sac of one fetus (Sebastian) ruptured.  Alkins began leaking fluid.  This worried her as she had given birth before, knew water breaking meant the baby would be born soon, and believed Sebastian needed the fluid to live.  The nurse called the doctor, who told Alkins the leaking was normal.  The leaking grew worse, and although the nurses initially responded to Alkins's calls, Alkins could not locate a nurse for three hours during the early morning hours of November 1.  Later that morning, a doctor informed Alkins and the father, Julian Tejeda, that Sebastian was deceased.  Nearly 70 hours had passed since Alkins was admitted to Inland.  An autopsy determined Sebastian's death was due to an infection.

## II.  *Factual Background*

On October 29, 2009, Alkins, who was 28 weeks pregnant with twins, noticed she was leaking pink-tinted fluid and called her doctor.  The doctor's nurse told her to go to the emergency room.  She was admitted to Inland around noon with bleeding and contractions and assessed as being in progression of preterm labor.  The next day, a doctor advised Alkins that Inland was not set up for premature births and she accepted transfer to another hospital.  She understood the transfer was for "care for the high-risk premature babies."  She was transported to Loma Linda by helicopter late that night and placed in the labor and delivery unit.

The next morning, on October 31, Dr. Bryan Oshiro examined Alkins and ordered continuous fetal heart monitoring. He also assessed her as carrying Group B Strep, which is a risk to premature babies. Later that morning, Alkins felt water leak and told a nurse she thought her water had broken. Medical progress notes from mid-day stated Alkins "continue[d] to complain of leaking of fluid and feeling wet." Dr. Arthur conducted an ultrasound and found Alkins had "PPROM," or preterm premature rupture of membranes, with respect to Sebastian. Alkins asked if the water breaking meant she would be having her babies, noting she previously gave birth after her water had broken. Dr. Arthur responded no, indicated twins were different, and explained babies can live from one to five days after the water breaks.

Dr. Arthur moved Alkins to the antepartum unit, for patients not expected to deliver imminently, and reduced fetal monitoring to one period per 12-hour nursing shift. According to Alkins, when she asked the nurse on duty why she was not wearing the fetal monitors, the nurse knew she was concerned, replaced the monitors for a few minutes, and told her the babies were fine, which is what she was "really worried about at that point."

Nurse Phyllis Zehms came on shift that evening. Alkins told her there was mucous and a "pink tinge" on the toilet paper when wiping, and she gave Alkins feminine pads. Around 12:20 a.m., Alkins showed her there was now slight red blood on the toilet paper. Nurse Zehms provided more pads and called Dr. Arthur, who advised Alkins the leaking was normal and due to her water breaking. Approximately an hour or two later,

5

Alkins began to experience worse leaking, eventually accumulating 15 to 20 pads. Nurse Zehms said "Oh, that's a lot" and called her supervisor. The supervisor indicated the doctor said the leaking was normal, but she would put in another call, and the nurses departed. Alkins recalled, "I had a lot of pads. So then I had to keep calling her." When Nurse Zehms finally arrived, Alkins told her she was "very scared because this is not normal to me, and this is a lot of fluid." Nurse Zehms said she had a call in to the doctor and departed. Her last chart entry was at 2:15 a.m.

Alkins continued to accumulate pads. She called Nurse Zehms again and received no response. Alkins waited half an hour, pushed the call button five more times, and Nurse Zehms still did not respond. Loma Linda records did not reflect hand-off to another nurse. Tejeda left to locate a nurse and found Nurse Elen Souza. Nurse Souza arrived by 5:20 a.m. Alkins told her about the leaking and, according to Alkins, she "look[ed] a little worried" and said she would call the doctor. Dr. Arthur arrived shortly before 7:00 a.m.

Alkins began to feel contractions and Dr. Arthur conducted an ultrasound soon thereafter. While she was doing so, Dr. Oshiro came by during his rounds, observed Sebastian had no fluid around him, and informed Alkins and Tejeda he was deceased. A pediatric pathologist performed an autopsy and determined the cause of death was infection consistent with Group B Strep.

### III. *Litigation and Trial*

Alkins sued Loma Linda and Dr. Arthur for medical negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress.[2] The matter proceeded to a bench trial. The parties presented several experts who offered conflicting opinions on whether Dr. Arthur and the nurses met applicable standards of care (including the issue of fetal monitoring), whether Sebastian experienced cord compression from reduced fluid levels and oxygen deprivation, and the causes of Sebastian's death.

Alkins also testified regarding her care at the hospital and her emotional distress. She noted that by the time she left Inland, she was "panicking and wondering what was going on." When her water broke and the leaking began, she thought "something [was] happening to my babies," explaining: "[W]hen my water breaks, I mean, I'm ready to have my babies. You know, I've had three before this one. So for me to have my water break and then go all these hours, you know, wasn't normal to me." When Dr. Oshiro said Sebastian was deceased, she and Tejeda "[c]ried so hard" and were "[s]o in shock."

Alkins's counsel then asked her how the experience made her feel. She testified: "I was so angry . . . . I was sad. I was depressed. [¶] . . . [¶] I felt that this could have been prevented and that I was being ignored. You know, I was calling for help and nobody would help me. [¶] . . . [¶] I felt like something was just yanked from me." She

---

[2]     Tejeda and the surviving twin joined in the suit, but their claims are not at issue.

stated that of all her feelings about the situation, the worst was "[b]eing neglected and ignored." On cross-examination, she agreed that "ranking right up there" was "the loss of memories, of companionship, of knowing that Sebastian . . . isn't and won't be a part of [her] family's life" and that it was "that loss of relationship that is most keenly felt by [her]." She also elaborated on the source of her anger, further agreeing that "by being inattentive, by not paying attention to that leaking, the hospital staff deprived [Sebastian] of what [he] needed in order to live by allowing [the] fluid to continue to leak." Her understanding was that "Sebastian would still be here if [she] wasn't neglected and ignored." Alkins acknowledged she was told several times she should not be concerned about the leaking. On redirect examination, Alkins clarified that it was the "grief at not having Sebastian," not the loss of relationship, that she experienced.

IV. *Statement of Decision and Judgment*

The trial court filed a proposed statement of decision and, following objections by Alkins, an amended statement of decision.[3]

On negligence, the trial court found Dr. Arthur was not negligent, rejecting Alkins's position that her failure to maintain continuous fetal heart monitoring fell below the standard of care. The court observed there were no developments during the overnight period that suggested Alkins or the fetuses were becoming unstable. It acknowledged the leaking caused her anxiety, but noted there was no evidence it created

---

[3]    We focus on the amended statement, unless otherwise noted.

8

any risk besides cord compression (which, it explained later, had existed since the membranes ruptured).

The court also found the nursing care was adequate on October 31, explaining, among other things, that the decision to discontinue monitoring was a physician issue and there was no evidence the nurses failed to communicate information that would have resulted in continuous monitoring. However, the court was "troubled by the gap in nursing documentation between 2:15 a.m. and 5:20 a.m." on November 1, noted Alkins's concern about the leaking and inability to find a nurse, and concluded the nursing care during this period was negligent.

Nevertheless, the court found Sebastian would not have been more likely to have survived if the nurses had met the standard of care. The court based this finding on the testimony of Loma Linda's experts that Sebastian likely had a Group B Strep infection long before the membranes ruptured, and that, by at least 12 hours before his death was discovered, the infection was too advanced for him to have survived. The court rejected the view of Alkins's experts that Sebastian's death was triggered by gasping from oxygen deprivation due to cord compression (which they opined caused the infection to enter his lungs). The court found no evidence of significant oxygen deprivation or significant cord compression and concluded "Sebastian's infection more likely than not was too advanced to be survivable," even if he had been delivered overnight.

On the claim for emotional distress damages related to the nurses' negligent care, the court first set out its factual findings. It found there was little testimony the leaking

9

caused injury to Alkins or had any medical significance to Sebastian beyond the risk of cord compression, which was already present. It also found "[n]o amount of nursing or physician intervention, short of delivery" or continuous fetal monitoring would have impacted the leaking. In its proposed statement, the court then assumed without substantive analysis that Alkins could state a claim "flowing from injury to oneself," but indicated Alkins had to demonstrate physical injury to do so. Absent physical injury to her, or any showing that adequate nursing care would have reduced the leaking, the court concluded she could not establish the nursing negligence was a substantial factor in her emotional distress.

Alkins objected, claiming she was not required to show physical injury, she did suffer serious emotional distress, and negligence was a substantial factor in causing it. In its amended statement, the court no longer stated physical injury was required to state a cause of action. Instead, it found Alkins testified she "felt neglected, abandoned, ignored and angry," but it could not say "that these feelings for approximately 3 hours caused [her] serious emotional distress," and "[w]hat caused serious emotional distress to [her] was the fact that she was scared, worried and stressed out that her babies were being harmed during this period." The court then reiterated its original statement that without

10

physical injury or evidence that compliant care could have relieved the leaking, it could not conclude the nursing negligence was a substantial factor in her emotional distress.[4]

Finally, the trial court determined Alkins had not established intentional infliction of emotional distress. It found "little or no evidence that any acts or omissions of the nursing staff were done with intent, malice, or wanton disregard for [her] well-being." The court observed that "from the time she presented to [Inland]," Alkins was "experiencing considerable anxiety and distress, knowing that the babies were too young to be born . . . . But it was the circumstances of her condition, not any intent to inflict distress[,] that produced [her] response."

The trial court entered judgment. Alkins filed a motion for new trial, in which she maintained her objections regarding negligent infliction of emotional distress. She included an attachment titled "Compilation of Severe Emotional Distress experienced by Priscilla Alkins," which described the series of events that transpired, starting with her admission to Inland. The trial court denied the motion, explaining her "emotional distress [was] the result of the misplaced fear that the leaking fluid would cause the demise of little Sebastian which the Court has found was not the cause." Alkins timely appealed.

---

4    The court also addressed whether Alkins could recover emotional distress damages based on Sebastian's death and concluded she could not do so. Alkins does not contest this finding on appeal.

DISCUSSION

I. *Standard of Review*

When we review a statement of decision by a trial court, "findings on questions of fact are reviewed under the substantial evidence standard. [Citation.]" (*Brewer v. Murphy* (2008) 161 Cal.App.4th 928, 935.) " 'We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court. [Citation.]' " (*Ibid.*) We also "must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision." (*Fladeboe v. American Isuzu Motors Inc*. (2007) 150 Cal.App.4th 42, 48.) The trial court's "conclusions of law are subject to independent review by an appellate court. [Citation.]" (*Brewer*, at p. 936.)[5]

II. *Law Governing Negligent Infliction of Emotional Distress*

It is well established "that '[t]he *negligent* causing of emotional distress is not an independent tort, but the tort of *negligence.* [Citation.] The traditional elements of duty,

---

[5] Relying on Code of Civil Procedure section 634 and *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, Alkins contends her objections to the proposed statement of decision preclude us from inferring the trial court found in favor of Loma Linda on certain issues. But objections are meant to identify omissions or ambiguities, not to reargue the merits. (Code Civ. Proc., § 634; *Heaps v. Heaps* (2004) 124 Cal.App.4th 286, 292.) Her objections contest either merits issues or legal ones (which we already review de novo), and thus do not impact our review. As for *Arceneaux*, it holds that to avoid implied findings, one cannot just request a statement of decision, but must also lodge objections. (*Arceneaux*, at pp. 1133-1134.) Alkins did object; her objections were just ineffective for the purpose she claims.

breach of duty, causation, and damages apply. . . .' [Citation.]" (*Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1072 (*Burgess*).)

Claims are analyzed under one of two theories of recovery:  "direct victim" and "bystander."  (*Burgess, supra*, 2 Cal.4th at pp. 1071-1072.)  Direct victim recovery is available when damages "result from the breach of a duty owed the plaintiff that is assumed by the defendant or imposed on the defendant as a matter of law, or that arises out of a relationship between the two."  (*Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583, 590 (*Marlene F.*).)  The bystander version of the claim requires a plaintiff to witness the injury-causing event, among other requirements, and is not at issue here.  (*Burgess*, at p. 1073.)

The emotional distress also must be "proximately caused by [the] breach of duty." (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 985 (*Potter*).)  Courts apply the substantial factor test in analyzing proximate cause.  (*People v. Holmberg* (2011) 195 Cal.App.4th 1310, 1321.)  "The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical."  (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 978 (*Rutherford*).)

Finally, the emotional distress must be serious, meaning " ' "a reasonable [person], normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." ' "  (*Potter, supra*, 6 Cal.4th at p. 989, fn. 12.)  Serious emotional distress is "functionally the same as . . . 'severe emotional

distress' " in the context of intentional infliction of emotional distress. (*Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1378.)

## III.  *Analysis*

### 1.  *Substantial Evidence Supports the Court's Judgment*

Alkins contends the trial court's negligent infliction of emotional distress ruling was not supported by substantial evidence.[6]

Substantial evidence supports the trial court's conclusion that the three hours of negligent nursing care was not a substantial factor in Alkins's serious emotional distress. Her testimony demonstrates that throughout her hospitalization, she was in a high state of anxiety.  By the time she left Inland, she was concerned about the fetuses, that concern grew after her water broke, increased further when she began leaking large amounts of fluid, and culminated in extreme grief when she learned Sebastian was deceased. Alkins's testimony further reflected her chief concern during the overnight period was the leaking, which she viewed as harmful to the fetuses.  She indicated that was the reason she kept calling Nurse Zehms and she specifically said she told the nurse she was "scared" because of the leaking fluid.  She claimed the nursing neglect was the worst feeling she experienced, but her statements about that neglect focused on Sebastian—

---

[6]     Alkins appears to contest the court's findings on both the extent and nature of her emotional distress and the cause of that distress.  However, the court found she experienced serious emotional distress; it simply concluded the nursing care was not its source.  In any event, because we find substantial evidence supports the no causation finding, we accept that Alkins experienced serious emotional distress.

14

including her apparent belief that he would be alive if the nurses had not neglected her. In describing her emotional distress in the "Compilation of Severe Emotional Distress" document she submitted with her new trial motion, she included events spanning her entire hospital stay, not just the three-hour period in question. Given this evidence, the trial court reasonably could conclude Alkins's serious emotional distress was caused by her concern about the twins, in the context of her extended, preterm labor and the inherent stress of such situation, and that the absence of the nurses for three hours did not contribute to that distress.

Alkins's arguments to the contrary are not persuasive. As an initial matter, she maintains her emotional distress testimony regarding the impact of the nursing care was undisputed. But even assuming she was emotionally distressed during the hospitalization and for a prolonged period upon her return home, the trial court, as fact finder, was entitled to weigh the credibility of her testimony regarding the *cause* of this distress. (See *Sprague v. Equifax* (1985) 166 Cal.App.3d 1012, 1031 [describing "credibility of plaintiff's claim that he continued to suffer emotional distress" as "matters for the jury, and not to be reweighed on appeal"].) We will not disturb that determination on substantial evidence review. (*San Diego Gas & Electric Co. v. Schmidt* (2014) 228 Cal.App.4th 1280, 1292.)

Similarly, Alkins's claim she was entitled to recover as she was an "unusually susceptible plaintiff" is unpersuasive. She relies on *Rideau v. Los Angeles Transit Lines* (1954) 124 Cal.App.2d 466, 471, which holds a tortfeasor "takes the person [it] injures as

15

[it] finds [her.]"  But this principle simply preserves the ability to recover damages when "by reason of some preexisting condition, [the] victim is more susceptible to injury." (*Id*.; CACI No. 3928.)  It does not eliminate the need for causation.  (See *Rideau*, at p. 471 [affirming damages where evidence showed "that as a proximate result of the . . . accident plaintiff suffered severe injuries, including aggravation of [a] previous . . . condition"].)  Here, the nursing negligence was not a proximate cause of Alkins's distress, so she could not recover regardless of her susceptibility.  For similar reasons, we reject Alkins's argument that she reasonably believed the nurses being present to assess the leaking could have prevented Sebastian's death.

Further, although Alkins alleges the nurses knew of her purported "unusual suscept[ibility]," the record does not support this claim.  Rather, it shows only that her chart reflected her medical condition, she called the nurses repeatedly, and she advised them about her concerns.  This is insufficient to show the nurses would have considered Alkins to be a pregnant woman who was especially susceptible to emotional distress.  Thus, we need not address the impact, if any, of such knowledge.

Alkins also suggests that even a "very minor force" that causes harm can be a substantial factor, and it would be impossible to conclude the nursing negligence did not qualify.  We agree a substantial factor can be minor, but it must still be a factor. (*Rutherford, supra*, 16 Cal.4th at p. 978.)  Here, as discussed *ante*, the trial court reasonably determined her distress was caused by her situation, not the nursing care.

16

Finally, Alkins argues that certain factual findings the court made in its statement of decision are unsupported by substantial evidence. These contentions also lack merit.

Alkins first focuses on the court's finding that she "testified that she felt neglected," but it could not say "these feelings for approximately 3 hours caused [her] serious emotional distress." She claims this demonstrates the court "fully accepted . . . her credibility as having this emotional distress from her neglect" and its finding was based on "an erroneous belief that there was a 3[-]hour duration or limit on her feeling neglected." We disagree. Read in context, the court's statement was not an indication it was deeming her credible, but rather, an acknowledgment of her testimony that she felt neglected by the nurses' three-hour absence, before finding those feelings did not contribute to her serious emotional distress.

Alkins next challenges the finding that no amount of medical intervention would have stopped the leaking or the anxiety she felt from it. She admits the leaking was a condition of her labor, but claims the evidence reflects the nurses could have reduced her anxiety that the fetuses were being harmed by it. However, as discussed *ante*, the court reasonably found her distress was due to fear for the fetuses, and her testimony reflected the leaking exacerbated that fear during the overnight period. If the nurses could not reduce the leaking, as Alkins concedes, the court also reasonably could find they could not reduce the anxiety from the leaking. Alkins's own testimony supports this finding, as it suggests the nurses could not have limited her fear about the leaking without stopping

17

it.  Indeed, she acknowledged she was angry, at least in part, because the nurses "allow[ed] [the] fluid to continue to leak."

Lastly, Alkins contends there is no substantial evidence to support the court's finding that continuous fetal monitoring would not have impacted the leaking.  However, the court determined the fetal monitoring decisions here were not negligent (a ruling Alkins does not challenge), so those decisions—and any related findings—are irrelevant to her claim for negligent infliction of emotional distress.

## 2. *Any Legal Errors Were Harmless*

Alkins also argues the trial court improperly required her to demonstrate physical injury and that adequate nursing care could have reduced the leaking, she was not required to prove these elements, and reversal is required.  We disagree.

Alkins has not established prejudicial error.  "An appellant bears the burden to show not only that the trial court erred, but also that the error was prejudicial in that it resulted in a miscarriage of justice." (*Hoffman Street, LLC v. City of West Hollywood* (2009) 179 Cal.App.4th 754, 772-773.)  A " 'miscarriage of justice' " occurs when the party appealing shows that a "different result would have been probable if the error had not occurred." (*Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1480.)  Consistent with these principles, when the record supports a judgment, notwithstanding a purported error, such error is harmless.  (See, e.g., *American Federation of State etc. Employees v. County of Los Angeles* (1983) 146 Cal.App.3d 879, 887 [affirming trial

18

court despite erroneous collateral estoppel ruling, where record supported judgment and the reviewing court therefore "view[ed] the error as harmless"].)

Here, as discussed *ante*, there was substantial evidence to support the trial court's determination that Alkins's serious emotional distress was not due to the absence of the nurses for three hours, but, rather, to her concern for the fetuses in the midst of her precarious, extended labor. The court reiterated this conclusion in its findings on intentional infliction of emotional distress and in its order on the new trial motion. At each step, the court impliedly rejected the credibility of Alkins's testimony as to the emotional impact of the nursing care and made clear it was not persuaded by her view of causation. Given this record, we do not see—and Alkins does not establish—how the court could have reached a judgment in her favor by not considering physical injury or the nurses' ability to stop the leaking. To the contrary, these issues appear to have no bearing on the court's key finding here: that Alkins's serious emotional distress was caused by her situation. Any error in considering these issues was harmless.[7]

---

[7] For purposes of this appeal, we have assumed Alkins could state a claim for emotional distress damages. Although not necessary for the resolution of this appeal, we think it appropriate to note that it is unclear whether a duty sufficient to support such damages actually exists. Alkins's relationship with Loma Linda does not appear to be dispositive (*Marlene F., supra*, 48 Cal.3d at p. 588 [duty depends on foreseeability and policy concerns]) and courts have found the requisite duty only in limited cases. (E.g., *Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 930-931 [misdiagnosis of plaintiff's wife with syphilis]; *Christensen v. Superior Court* (1991) 54 Cal.3d 868, 894-896 [mishandling of remains by a crematorium]; *Burgess, supra*, 2 Cal. 4th at p. 1076 [negligent delivery *causing* permanent brain and nervous system damage to child].) If such duty existed and Alkins had a claim, she is correct that she would not have to prove physical injury. (*Molien*, at p. 929 [physical injury not required

DISPOSITION

The judgment is affirmed.  The parties are to bear their own costs on appeal.


HALLER, Acting P. J.

WE CONCUR:



AARON, J.



PRAGER, J.*

---

for recovery].)  But courts have not recognized the requisite duty in the context before us (i.e., negligent care during labor that causes no physical injury; cf. *Burgess*, at p. 1076), and it is not clear they would do so.  (See *Potter, supra*, 6 Cal.4th at p. 985 ["with rare exceptions, a breach of . . . duty must threaten physical injury" to support emotional distress damages]; *Selden v. Dinner* (1993) 17 Cal.App.4th 166, 176 [describing doctor's duties as fulfillment of promises and treatment within the standard of care, and stating "[w]e are unaware of any other duty which arises *by virtue* of the physician-patient relationship."].)  Again, however, any error was harmless, for the reasons discussed *ante*.

\*      Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.